801 F.2d 799
 42 Empl. Prac. Dec. P 36,760, 55 USLW
2160, 35 Ed. Law Rep. 51
 Rita Sanders GEIER, et al., Plaintiffs-Appellees,
United States of America, Plaintiff-Intervenor-Appellant,
Raymond A. Richardson, Jr., et al., Plaintiffs-Intervenors-Appellees,
H. Coleman McGinnis, et al., Plaintiffs-Intervenors-Appellees,
v.
Lamar ALEXANDER, et al., Defendants-Appellees.
 No. 84-6055.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 17, 1986.
Decided Sept. 5, 1986.
 
 Michael A. Carvin (argued), U.S. Dept. of Justice, Washington, D.C., Joe B. Brown, U.S. Atty., Nashville, Tenn., Miriam Eisenstein, (Lead), George Schneider, Nathaniel Douglas, Lavern M. Younger, General Litigation Section, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., Walter W. Barnett, Appellate Section, for U.S., plaintiff-intervenor-appellant.
 W.J. Michael Cody (argued), Atty. Gen. of Tennessee, Nashville, Tennessee, R. Stephen Doughty & Richard Colber, for State defendant.
 George E. Barrett, Barrett and Ray, Nashville, Tenn., for Rita S. Geier.
 Avon N. Williams, Jr., Richard Dinkins, Nashville, Tenn., Joel Berger, (Lead) argued, Legal Defense Fund, Theodore M. Shaw, Julius LeVonne Chambers, New York City, for Raymond Richardson, et al.
 John Norris, Hollins, Wagster and Yarbrough, Nashville, Tenn., for H. Coleman McGinnis, et al.
 Julian W. Blackshear, Jr., Robert Smith, Petway and Blackshear, Nashville, Tenn., for amicus curiae TSU Nat. Alumni Ass'n.
 Beauchamp Brogan, University of Tennessee, James W. Drinnon, Jr., Assistant General Counsel, Administrative Building, Knoxville, Tenn., for defendants-appellees.
 Lewis Laska, Associate Professor, School of Business, Tennessee State University, Nashville, Tenn., pro se.
 Robert Greene, Lead Counsel, Nashville, Tenn., for Tennessee State Nat. Alumni
 Before LIVELY, Chief Judge, MILBURN, Circuit Judge, and PECK, Senior Circuit Judge.
 LIVELY, Chief Judge.
 
 
 1
 The United States, an intervenor in an action seeking desegregation of public institutions of higher learning in Tennessee, appeals from a consent decree containing affirmative action provisions. The original plaintiffs, intervening individual plaintiffs, and their successors and the State of Tennessee defendants signed the consent decree and agreed to its entry. Of the parties remaining in the case after more than 15 years of litigation, only the United States objected to the consent decree. In approving the consent decree the district court found that there was a compelling interest in eliminating the residual effects of de jure segregation in Tennessee's higher education system, that less drastic remedial orders had failed to achieve this result, and that the order was designed to achieve the goal of "a system of higher education in Tennessee tax supported colleges and universities in which race is irrelevant, in which equal protection and equal application of the laws is a reality." Geier v. Alexander, 593 F.Supp. 1263, 1267 (M.D.Tenn.1984).
 
 I.
 
 2
 This action began with a complaint by several individuals seeking to enjoin the University of Tennessee from constructing a new facility to expand its program at a non-degree granting "center" in Nashville. The reasoning of the plaintiffs was that any expansion of the University of Tennessee in Nashville (UT-N) would affect the efforts of Tennessee A & I State University, a predominantly black institution, to desegregate its student body and faculty. The United States intervened in the action as a plaintiff pursuant to Title IX of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000h-2 (1982). The intervening complaint of the United States went beyond the request for an injunction and requested the court to "order the State defendants to present a plan calculated to produce meaningful desegregation of the public universities of Tennessee." Sanders v. Ellington, 288 F.Supp. 937, 939 (M.D.Tenn.1968).
 
 
 3
 The district court found that six years elapsed after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), before racial requirements for admission to Tennessee's public universities and colleges were abolished. Although all institutions were following a policy of open-door admissions by 1968, the district court found that "the dual system of education created originally by law has not been effectively dismantled." Id. at 940. Upon concluding that the University of Tennessee had no intention of converting its Nashville center into a degree-granting institution, the district court denied the original plaintiffs' request for an injunction. However, relying principally on Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the district court stated it was "convinced that there is an affirmative duty imposed upon the State by the Fourteenth Amendment to the Constitution of the United States to dismantle the dual system of higher education which presently exists in Tennessee." Id. at 942. In accordance with this conclusion the district court ordered the defendants (all of whom are state officials, agencies or institutions) to submit a plan "designed to effect such desegregation of the higher educational institutions in Tennessee, with particular attention to Tennessee A & I State University, as to indicate the dismantling of the dual system now existing." Id. The defendants did not appeal.
 
 
 4
 The defendants submitted a plan to the court which relied primarily on the efforts of individual predominantly white institutions to expand and intensify efforts to recruit black students and faculty. The plan called for Tennessee State University (TSU), the former Tennessee A & I State University, to seek to recruit white students and faculty and to develop and publicize academic programs that would attract white as well as black students from the Nashville area. The individual plaintiffs and the United States filed objections to the plan and after a hearing the district court found that the plan lacked specificity. Instead of disapproving the plan, the district court directed the defendants to file a report showing what had been done to implement each individual component of the plan.
 
 
 5
 The defendants filed a report which showed some progress in attracting black students to the formerly all-white institutions, but little improvement in the number of black faculty at those schools and virtually no progress in desegregating TSU. The individual plaintiffs filed a motion for further relief, contending that the plan and report failed to offer a scheme for dismantling the dual system of public higher education as ordered by the court. While this motion was under consideration a new report showed that TSU remained 99.7% black and that its entering class in the fall of 1970 was 99.9% black. The district court found that so long as TSU remained overwhelmingly black it could not be found that the Tennessee defendants had dismantled the dual system or that they were "in any realistic sense, on their way toward doing so." Geier v. Dunn, 337 F.Supp. 573 (M.D.Tenn.1972).
 
 
 6
 The district court found that an "open door policy, coupled with good faith recruiting efforts, ... is sufficient as a basic requirement " in cases involving the desegregation of institutions of higher learning. Id. at 580 (italics in original). However, when this basic requirement fails to accomplish the goal of eliminating identifiably "white" and "black" institutions, something more is required. In determining what the court should require of the defendants to comply with their affirmative duty to dismantle the dual system, the district judge stated that he would rely on traditional equitable principles, balancing the various interests involved, considering the workability of any proposed remedy and tailoring the "gravity" of the relief required to the "gravity" of the situation to be remedied. The defendants were directed to present a plan to the court by March 15, 1972 that would provide for substantial desegregation of the TSU faculty and for allocation of programs to TSU to ensure a substantial white presence on the TSU campus. Id. at 581.
 
 
 7
 The defendants submitted several plans and amendments in ensuing years, and the district court ordered that some courses and fields of study be offered exclusively in the Nashville area at TSU. Contrary to the district court's earlier expectations the University of Tennessee did convert UT-N into a degree-granting institution and this exacerbated TSU's problems in attracting white students. All plaintiffs, including the United States, proposed a merger of TSU and UT-N with TSU as the surviving institution. The district court held a month-long evidentiary hearing on this proposal in 1976. After considering voluminous records and a great deal of testimony the district court found steady, but slow progress in attracting black students and faculty to the former white institutions, but, as before, little or no progress in converting TSU from a one-race university. The court concluded that the plans used over the eight years that this litigation had been in progress had not worked and showed no prospect of working. In light of this conclusion the district court ordered the merger of TSU and UT-N into a single institution under the Board of Regents, a body that governed all regional state institutions of higher learning in Tennessee as well as TSU. The district court chose this "drastic remedy" because "the State's actions have been egregious examples of constitutional violations." Geier v. Blanton, 427 F.Supp. 644, 660 (M.D.Tenn.1977).
 
 
 8
 This court affirmed the district court, Geier v. University of Tennessee, 597 F.2d 1056 (1979), and the Supreme Court denied certiorari, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979). In affirming, this court agreed with the district court's original conclusion that the Green v. County School Board pronouncement of an affirmative duty to remove all vestiges of state-imposed segregation applies to public higher education as well as to education at lower levels. We rejected the argument that Green applies only to elementary and secondary education, agreeing with the holding of a three-judge court in the Fourth Circuit that " 'the state's duty is as exacting' to eliminate the vestiges of state-imposed segregation in higher education as in elementary and secondary school systems; it is only the means of eliminating segregation which differ." Id. at 1065, quoting Norris v. State Council of Higher Education, 327 F.Supp. 1368, 1373 (E.D.Va.1971), aff'd per curiam sub nom. Board of Visitors of the College of William & Mary in Virginia v. Norris, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971). Thus we recognized the intrinsic differences in the degree of control which local school boards and institutions of higher learning can exercise over the make-up of student bodies. Such affirmative acts as busing and adjustment of attendance zones are not available to desegregate higher education. Nevertheless, we affirmed that the duty to remove all vestiges of de jure segregation is the same.
 
 
 9
 This court also held that the findings upon which the district court based its decision were not clearly erroneous, id. at 1067, and that the remedy ordered was within the traditional bounds of equitable relief, properly related to a condition found to offend the Constitution. Id. at 1068.
 
 
 10
 We have detailed the history of this litigation in order to show the setting in which all of the original parties and the intervening individual plaintiffs finally reached agreement on a plan to achieve the goal of a unitary system of public higher education in Tennessee. Further, the plan embodied in the consent decree was the culmination of long hours and days of negotiations in which all parties, including the United States, participated.
 
 II.
 A.
 
 11
 Although the "Stipulation of Settlement," which became the consent decree when approved by the district court, imposed a broad range of affirmative obligations on the defendants, all defendants agreed to its entry. As the only objecting party the United States has limited its objection on appeal to the provisions of Part II(N):
 
 
 12
 N. Defendants will coordinate the development of a cooperative program to increase the number of black students who enroll in and graduate from professional programs. Every spring beginning in 1985 and for five years, 75 black sophomore students who are Tennessee residents enrolled in Tennessee public institutions will be selected by committees representing the faculties of all state-supported professional schools and all other public universities in the state for pre-enrollment in the state's schools of law, veterinary medicine, dentistry, pharmacy and medicine. There shall be representation by black faculty members on these committees, to the extent available. The professional schools will counsel these students, assist in planning their pre-professional curricula, provide summer programs at the end of their junior and senior years and agree to their admission as first year professional students if they successfully complete their undergraduate work and meet minimum admissions standards. Defendants will consult with other states that have developed similar programs [e.g., Kentucky] and complete development of the program described in this paragraph II, (N), including a proposed budget and projected source of funds, within 180 days.
 
 
 13
 The decree imposed no obligation on the United States.
 
 
 14
 In its opening brief in this court the United States articulated its objection to Part II(N) as follows:
 
 
 15
 The ground for our objection was that the provision both exceeds the scope of judicial remedial power and violates the Equal Protection Clause by using an express racial criterion and by according preferential treatment to blacks who, by definition, have never been victims of discrimination in professional school admissions.
 
 
 16
 Appellant's Brief at 13-14 (footnote omitted). The United States also claimed error in the failure of the district court to hold an evidentiary hearing on its objections "to determine whether the proposed relief was necessary and/or permissible." Id. at 14.
 
 B.
 
 17
 Virtually the entire argument by the Department of Justice in the district court was built upon the theory of "victim specificity." This theory holds that a court may order affirmative action only to benefit individuals who have been identified as actual victims of past or ongoing acts of illegal discrimination. This argument was recently rejected by the Supreme Court in two cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. (1982). In Local 28 of the Sheet Metal Workers' International Ass'n v. Equal Employment Opportunity Commission, --- U.S. ----, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), the union, supported by the United States as amicus curiae, sought to reverse an affirmative action order that contained a "membership goal" on the ground, inter alia, that Sec. 706(g) of the 1964 Act "authorizes a district court to award preferential relief only to the actual victims of unlawful discrimination." --- U.S. at ----, 106 S.Ct. at 3034-35 (opinion of Justice Brennan, with Justices Marshall, Blackmun and Stevens concurring) (footnote omitted). This plurality of four Justices rejected the argument that a court may not order benefits to be extended except to identified victims. Id. Justice Powell concurred in the judgment and wrote that the remedy in the case violated neither Title VII nor the Equal Protection Clause of the Constitution. --- U.S. at ---- - ----, 106 S.Ct. at 3053-56.
 
 
 18
 In Local No. 93, International Ass'n of Firefighters, etc. v. City of Cleveland, --- U.S. ----, 106 S.Ct. 3063, 92 L.Ed.2d 405, also decided July 2, 1986, a union and the United States as amicus curiae sought to overturn a consent decree that imposed promotion goals on the city. As in the present case, all of the original parties to the suit agreed to an affirmative action plan. The union, as an intervening defendant, and the United States objected to the "quotas" and argued that the district court exceeded its authority under Title VII in approving the consent decree. Specifically, the union and the Department of Justice argued that Sec. 706(g) precluded the entry of a consent decree that might benefit some minority individuals who were not identified as actual victims of unlawful discrimination. While deciding the case on other grounds the Court stated:
 
 
 19
 The Court holds today in Sheet Metal Workers v. EEOC, [--- U.S. ----, 106 S.Ct. 3019, 92 L.Ed.2d 344], that courts may, in appropriate cases, provide relief under Title VII that benefits individuals who were not the actual victims of a defendant's discriminatory practices.
 
 
 20
 --- U.S. at ----, 106 S.Ct. at 3072.
 
 C.
 
 21
 In view of these pronouncements of the Supreme Court, the Department of Justice did not press its "victim specificity" theory in oral argument before this court. Although both Sheet Metal Workers v. EEOC and Firefighters v. City of Cleveland determined only that Title VII does not require victim specificity, the Department of Justice does not argue that these decisions are inapplicable to the present case which arose under the Fourteenth Amendment. In view of the long line of school desegregation cases in which affirmative action plans have been upheld without regard to whether each beneficiary was an identifiable victim of discrimination, it would be futile to argue that remedies under the Equal Protection Clause are limited by the theory of victim specificity.
 
 
 22
 The Department of Justice makes the broader argument that the use of "racial quotas" to prefer minority students in this case deprived non-minority students of equal protection. There are three facets to this argument. In the first place, it is claimed that cases such as Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), which require all vestiges of past discrimination to be eliminated "root and branch," do not control litigation concerned with segregation in public higher education. The Department of Justice argues that since higher education is a voluntary activity, a state satisfies the Constitution by putting an end to discriminatory practices, and has no obligation to eliminate the vestiges of past discrimination. According to this contention, the only justification for approving affirmative action decrees in school cases lies in the fact that school attendance is compulsory at the elementary and secondary levels and a state cannot require pupils to attend segregated schools. Thus since attendance at colleges and universities is voluntary, the state had no compelling interest in embarking on additional remedial action after it had established "neutral admissions standards." As its second argument the appellant maintains that the former dual system of higher education was effectively dismantled by the prior decrees in this case. Finally, the Department of Justice argues that even if an affirmative order is permissible in a higher education case the remedy included in the consent decree was not "narrowly tailored" to embody the least restrictive method for curing the condition sought to be corrected.
 
 1.
 
 23
 The principal authority cited in support of the first equal protection argument was Bazemore v. Friday, --- U.S. ----, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), in which a majority of the Supreme Court held that the North Carolina Agricultural Extension Service fulfilled its constitutional obligation by adopting a wholly neutral admissions program for local 4-H and Homemaker Clubs that had been segregated prior to 1965. In response to the Civil Rights Act of 1964 the extension service discontinued its past practice of maintaining separate white and black clubs. Nevertheless, there continued to be many all-white and all-black clubs. In Bazemore the district court found no evidence of discrimination after the clubs were opened to members of all races and concluded that any remaining racial imbalance in the clubs resulted from wholly voluntary choices of the individual members.
 
 
 24
 The Supreme Court affirmed the finding that there is no current violation of the Fourteenth Amendment because club membership is voluntary. Distinguishing the Green requirement of affirmative steps to end dual school systems, the Court stated:
 
 
 25
 While school children must go to school, there is no compulsion to join 4-H or Homemaker Clubs, and while School Boards customarily have the power to create school attendance areas and otherwise designate the school that particular students may attend, there is no statutory or regulatory authority to deny a young person the right to join any Club he or she wishes to join.
 
 
 26
 --- U.S. at ----, 106 S.Ct. at 3013.
 
 
 27
 We believe the Department of Justice reads too much into Bazemore. While no one is compelled to enter a profession, in order to do so a person must attend a university offering courses of study leading to a degree in the profession selected. The State of Tennessee offers this professional training at public institutions that were formerly segregated by law. The district court found that the present disparity between black and white enrollment in professional studies resulted from the long history of denial of equal educational opportunities to generations of black Tennesseans. The district court also found that the disproportionately low black enrollment in all areas of higher education at the beginning of this litigation resulted from decades of separate and unequal education of black students at every level in Tennessee. It appears fallacious to attempt to extend Bazemore to any level of education. While membership in 4-H and Homemaker Clubs offers a valuable experience to young people and families, particularly in rural areas, it cannot be compared to the value of an advanced education. The importance of education to the individual and the interest of the state in having its young people educated as completely as possible indicate clearly that the holding in Green rather than that of Bazemore applies.
 
 
 28
 It was established as the law of the case in the present litigation more than 15 years ago that Green applies to the desegregation of public higher education, and the United States did not argue to the contrary before the district court. In the only previously appealed decision, Geier v. University of Tennessee, 597 F.2d 1056 (1979), this court held that "the Green requirement of an affirmative duty applies to public higher education as well as to education at the elementary and secondary school levels." Id. at 1065. Nothing in the Bazemore decision, where the compelling interest of a state in the education of its citizenry was not involved, requires us to reexamine these holdings.
 
 
 29
 Four years before its decision in Brown v. Board of Education the Supreme Court held that the Fourteenth Amendment precludes a state from requiring black law students and graduate students to attend separate professional and graduate schools from those attended by white students. Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). The remedy prescribed in Sweatt was that the black applicant be admitted to the University of Texas Law School. No later case has held, or even hinted that affirmative remedies are not available to remove the vestiges of past unlawful segregation in public higher education.
 
 2.
 
 30
 The Department of Justice asserts that the illegal condition of segregation in public higher education in Tennessee was cured by adoption of an open-admissions policy and compliance with the district court's prior decrees, and thus the state had no compelling interest in embarking on additional remedial action. This position is contrary to specific findings of the district court in decisions that became final without appeal. In the first Geier decision the district court found that fourteen years after Brown v. Board of Education nothing had been done to dismantle effectively the dual system of higher education in Tennessee. 288 F.Supp. at 942. Four years later the district court concluded that the affirmative duty to dismantle the dual system remained despite an open-door policy of admissions and good faith recruitment efforts. 337 F.Supp. at 580. In 1977 the district court found that plans adopted in over eight years of litigation had not worked and showed no prospect of working. 427 F.Supp. at 656. In ordering a "drastic remedy" the court found that the state's actions "have been egregious examples of constitutional violations." Id. at 660. In approving the consent decree the district court relied on these earlier findings and its own determination that the residual effects of past discrimination have not been eliminated. 593 F.Supp. at 1265-66. The United States participated fully in all stages of the proceedings leading to these decisions. We think the record in this case establishes without question that a "compelling governmental interest" is involved. The United States has not denied that the state has such an interest in providing equal educational opportunities at all levels to all its residents.
 
 3.
 
 31
 We also believe that Part II(N) of the consent decree was "narrowly tailored" to the achievement of this goal. Sheet Metal Workers v. EEOC, --- U.S. at ----, 106 S.Ct. at 3055 (Powell, J., concurring). Since Part II(N) does contain percentage goals, we examine it further in light of the four factors Justice Powell prescribes in considering race-conscious hiring remedies, though there are differences between hiring goals and goals related to the selection of undergraduate students for possible post-graduate professional training. The first factor is the efficacy of alternative remedies. The record in this case demonstrates conclusively that sixteen years of alternative efforts failed to remove the vestiges of de jure segregation. The second factor is the planned duration of the remedy. The duration in this case is five years--a reasonable time by any yardstick. The third factor is whether the goal is related to the percentage of minority group numbers in the relevant population. The goal of 75 black candidates for professional education each year for five years in Tennessee's public universities is modest by any standard and certainly does not exceed the size of the relevant pool of minority prospects for such education. The final factor is whether waiver provisions are available in the event the goal is not met. In approving the consent decree the district court pointed out that its "numerical references" are clearly defined as objectives only and went on to state: "Whether or not the goal is reached or exceeded will only be one of many indicia of the good faith efforts of all the parties to achieve a unitary system...." 593 F.Supp. at 1267. This statement, referring to all of the goals in the consent decree, indicates sufficient flexibility to satisfy the fourth factor.
 
 
 32
 The Department of Justice proposed a preferential admissions program open to disadvantaged students of all races in lieu of the program contained in the stipulation of settlement. Such a program would certainly be commendable, but it would not be tailored to the problem with which the district court had been wrestling for more than 15 years. Given the record in this case we cannot find an abuse of discretion in the district court's acceptance of the program agreed to by the parties most directly involved rather than the less specifically directed one proposed by the intervenor.
 
 
 33
 The most telling feature with respect to the narrowness of Part II(N) is that it does not guarantee that any black student chosen during his or her sophomore year will ever be enrolled in a professional school. The professional schools are required to admit these students only "if they sucessfully complete their undergraduate work and meet minimum admissions standards." This plan does no more than offer remedial aid to apt black students to help them throw off the disadvantages attendant to a long history of discrimination. It is merely a catch-up provision. The percentage goals of Part II(N) are just a modest step toward the larger goal of a Tennessee system of higher education in which no component is identifiable by race. They do not impose the same serious consequences on members of the majority race as the protections from layoff stuck down in Wygant v. Jackson Board of Education, --- U.S. ----, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). They are much more like the hiring goals approved in Sheet Metal Workers v. EEOC and Firefighters v. City of Cleveland in their impact on individual members of the majority.
 
 III.
 A.
 
 34
 The final contention of the appellant is that it was an abuse of discretion for the district court to approve the consent decree without conducting an evidentiary hearing on the Department of Justice's objections.
 
 
 35
 It has been noted that the United States intervened in this action in 1968 and participated in every phase of the case thereafter, including many evidentiary hearings as well as the negotiations that produced the consent decree. The record is filled with evidence which supports the district court's several findings that the vestiges of state-imposed segregation had not been removed. The Department of Justice argues, however, that it was entitled to an evidentiary hearing in order to demonstrate that the low minority enrollment in professional schools is not a vestige of the dual system.
 
 
 36
 The district court conducted three hearings at which it heard arguments on the objections to the consent decree. At the first hearing Mr. Douglas, representing the Department of Justice, stated that he was concerned that there was no foundation for the numerical goals in the decree, but acknowledged that he was not then asking for an evidentiary hearing. Joint Appendix (J.A.) 384. Without mentioning the professional school program specifically, he argued it would be better to have a plan based on "strategies" for desegregation rather than to have essentially arbitrary numerical goals. J.A. 400-01. The district judge asked that the objections be made more specific, and set the matter for a later hearing.
 
 
 37
 Following the second hearing, which centered primarily on conditions at TSU, the district court directed the attorney for the United States to file detailed written objections to the consent decree, and set the matter for a third hearing. The heart of the written objections is found in Part II, captioned "A Court's Remedial Authority To Order Affirmative Equitable Relief Is Limited to those Measures Necessary to 'Make Whole' Actual Victims of Unlawful Discrimination." There follows a recitation of the arguments put forward by the Department of Justice in many cases in recent years where it has sought to limit affirmative action according to its theory of "victim specificity." The same arguments were made to the Supreme Court and rejected in Sheet Metal Workers v. EEOC and Firefighters v. City of Cleveland.
 
 
 38
 At the third hearing, following submission of the written objections, Assistant Attorney General William Bradford Reynolds appeared for the United States. Mr. Reynolds argued that an evidentiary hearing was required to determine the basis for the latest report showing that the 1984 entering class at TSU was still 90% black. He stated that it was not at all clear to him that this figure resulted from discrimination or that there had been a failure to dismantle the dual system. In further colloquy Mr. Reynolds said he thought the state should have an opportunity to prove that it was in full compliance with the previous decree before the court entered the consent decree imposing additional duties. The court then reminded the Assistant Attorney General that the state had agreed to the consent decree and did not seek an evidentiary hearing. Then, speaking only for the United States, Mr. Reynolds stated:
 
 
 39
 What I'm suggesting is that this Court's ability in the absence of the consent of all parties to enter a modification of the decree is--I would say something that this Court lacks the authority to do unless you can show that there's been a change in the operational law as it was at the time the decree was entered which I would submit is not the case. Or you can show on a factual record that there has been a sufficient change in the factual situation to warrant modification.
 
 
 40
 J.A. 463. In response to the district judge's question, Mr. Reynolds agreed that a third ground for the court's authority to approve the consent decree would arise from the court's duty to monitor its previous decree, but he insisted that an evidentiary hearing would be required before this authority could be exercised.
 
 
 41
 The Department of Justice never made a proffer of evidence, and never indicated that there was any evidence in existence that contradicted the statistical evidence in the record upon which the court relied. This evidence disclosed that despite the implementation of several programs seeking to increase black enrollment in professional studies, very little progress had been made. Tennessee's population is 15.8% black. In 1984 black enrollment in the state's professional schools was 4.2%. The case had been set for trial on July 30, 1984 and after the original parties reached a settlement the hearings on objections to the consent decree took place on July 30, August 2 and August 13, 1984. Thus, at the time of the hearings, the Department of Justice should have known what proof, if any, it had to support its position.
 
 B.
 
 42
 Firefighters v. City of Cleveland involved a consent decree in a Title VII case. The Supreme Court discussed the hybrid nature--part judgment and part voluntary agreement--of consent decrees, and affirmed that a federal court may enter a consent decree that includes broader relief than the court could have ordered after a trial. --- U.S. at ----, 106 S.Ct. at 3076-77. Turning to the rights of an intervening party who objects to a consent decree, the Court stated:
 
 
 43
 A consent decree is primarily a means by which parties settle their disputes without having to bear the financial and other costs of litigating. It has never been supposed that one party--whether an original party, a party that was joined later, or an intervenor--could preclude other parties from settling their own disputes and thereby withdrawing from litigation. Thus, while an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392, 400 [102 S.Ct. 1127, 1131, 1136, 71 L.Ed.2d 234] (1982); Kirkland v. New York State Dept. of Correctional Services, 711 F.2d 1117, 1126 (CA2 1983), cert. denied, 465 U.S. 1005 [104 S.Ct. 997, 79 L.Ed.2d 230] (1984). Here, Local 93 took full advantage of its opportunity to participate in the District Court's hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence; the District Court carefully considered these objections and explained why it was rejecting them. Accordingly, "the District Court gave the union all the process that [it] was due...." Zipes, supra, [455 U.S.] at 400 [102 S.Ct. at 1136].
 
 
 44
 Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and a fortiori may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor. 3B Moore p 24.16, p. 181; see also, United States Steel Corp. v. EPA, 614 F.2d 843, 845-846 (CA3 1979); Wheeler v. American Home Products Corp., 563 F.2d 1233, 1237-1238 (CA5 1977). And, of course, a court may not enter a consent decree that imposes obligations on a party that did not consent to the decree. See, e.g., United States v. Ward Baking Co., 376 U.S. 327 [84 S.Ct. 763, 11 L.Ed.2d 743] (1964); Hughes v. United States, 342 U.S. 353 [72 S.Ct. 306, 96 L.Ed. 394] (1952); Ashley v. City of Jackson, 464 U.S. at 902 [104 S.Ct. 255 at 257, 78 L.Ed.2d 241] (REHNQUIST, J., dissenting from denial of certiorari); 1B Moore p 0.409, p. 326, n. 2. However, the consent decree entered here does not bind Local 93 to do or not to do anything. It imposes no legal duties or obligations on the Union at all; only the parties to the decree can be held in contempt of court for failure to comply with its terms. See United States v. Armour & Co., 402 U.S. at 676-677 [91 S.Ct. 1752 at 1754-55, 29 L.Ed.2d 256 (1971) ].
 
 
 45
 Id. at ----, 106 S.Ct. at 3079-80.
 
 
 46
 At oral argument in this appeal the Department of Justice emphasized the statement in the quoted passage that the intervening union was permitted to introduce relevant evidence and argued that it was an abuse of discretion for the district court to enter the decree here without an evidentiary hearing. We disagree. The transcript of the three hearings on objections makes it clear that the Department of Justice was questioning the district court's interpretation of the voluminous statistical evidence. Its attorneys never even hinted at the availability of evidence that would differ from that reported to the court by the state defendants and the court-appointed monitoring committee. Even if the Department of Justice had been prepared to offer evidence, it is clear from its detailed written objections that such evidence would have been in support of its now-discredited theory of a victim specificity limitation on all affirmative action remedies.
 
 C.
 
 47
 All of the parties directly involved in this case agreed to settle it after sixteen years of litigation. In the early years it was the United States that exhorted the court to broaden its remedial orders while the state sought to restrict them. At the very time the state became convinced that its earlier efforts had failed to eliminate the vestiges of its past discriminatory practices, the Department of Justice was urging the court to pull back--a truly ironic situation. The district court did not abuse its discretion when, after considering the intervenor's detailed written objections and conducting three hearings, it approved a settlement agreed to by all the original parties to the action.
 
 
 48
 A statement by the Second Circuit in regard to an intervenor's objection to settlement of a class action seems appropriate here:
 
 
 49
 In general the position taken by the objectors is that by merely objecting, they are entitled to stop the settlement in its tracks, without demonstrating any factual basis for their objections and to force the parties to expend large amounts of time, money and effort to answer their rhetorical questions, notwithstanding the copious discovery available from years of prior litigation and extensive pre-trial proceedings. To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process. On their theory no class action would ever be settled, so long as there was at least a single lawyer around who would like to replace counsel for the class and start the case anew. To permit the objectors to manipulate the distribution of the burden of proof to achieve such an end would be to permit too much. Although the parties reaching the settlement have the obligation to support their conclusion to the satisfaction of the District Court, once they have done so, they are not under any recurring obligation to take up their burden again and again ad infinitum unless the objectors have made a clear and specific showing that vital material was ignored by the District Court. There is no need for the District Court to hold an additional evidentiary hearing on the propriety of the settlement. Its conclusion appears to have been reached only after a thorough investigation of all relevant facts.
 
 
 50
 City of Detroit v. Grinnell Corp., 495 F.2d 448, 449, 464 (2d Cir.1974).
 
 
 51
 The district court rejected the argument that it could not properly conclude from the record that the low minority enrollment in Tennessee's public professional schools resulted from past discriminatory practices. The district court was fully justified in making this determination. Applicants do not arrive at the admissions office of a professional school in a vacuum. To be admitted they ordinarily must have been students for sixteen years. Students applying for post-graduate schooling in the 1983-84 school year would have begun school at age six in 1967 and would have entered college in 1979. The district court had made consistent findings between 1968 and 1984 that the public colleges and universities of Tennessee had not eliminated the vestiges of their years of operation under state-imposed segregation. The district court could also take judicial notice of findings by the district courts and this court that those vestiges had not been eliminated from many of the public school systems of Tennessee, all of which were operated under the same state-imposed system of separate schools for the two races. E.g. Kelley v. Metropolitan County Board of Education, 687 F.2d 814, 816 (6th Cir.1982), cert. denied, 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983); Northcross v. Board of Education, 466 F.2d 890 (1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1355, 35 L.Ed.2d 586 (1973).
 
 
 52
 The consent decree in this case does not seek to remedy some amorphous "societal" wrong. It is directed solely at the continuing effects of past practices that adversely affected black Tennesseans as they moved through the public school systems and the higher education system of the state. The consent decree imposes no obligations on the United States, and the state defendants have agreed to assume those that it imposes upon them. It represents the first agreement of substance in this long and sometimes bitter litigation. The district court did not abuse its discretion in entering the consent decree without the approval of one intervening party.
 
 
 53
 The judgment of the district court is affirmed.