871 F.2d 1310
 49 Empl. Prac. Dec. P 38,903, 57 USLW
2599, 52 Ed. Law Rep. 941
 Rita Sanders GEIER, et al., Plaintiffs-Appellees,
United States of America, Plaintiff Intervenor-Appellant,
v.
Raymond RICHARDSON, Jr.; et al., Plaintiffs Intervenors-Appellees.
H. Coleman McGINNIS, et al., Plaintiffs Intervenors-Appellees,
v.
Ned McWHERTER, et al., Defendants-Appellees.
 No. 88-5155.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 12, 1988.
Decided April 12, 1989.
 
 George Barret, Nashville, Tenn., for plaintiffs-appellees.
 Joe B. Brown, James C. Thomason, III, Asst. U.S. Atty., Office of the U.S. Atty., Nashville, Tenn., Wm. Bradford Reynolds, Asst. Atty. Gen., Nathaniel Douglas, Levern M. Younger, Roger Clegg, Deputy Asst. Atty. Gen., argued, U.S. Dept. of Justice, Civ. Rights Div., Educational Opportunities Litigation Section, David M. Thompson, Dennis J. Dimsey, William R. Yeomans, U.S. Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, D.C., for plaintiff-appellant.
 Richard H. Dinkins, Jr., Williams & Dinkins, Nashville, Tenn., Joel Berger, NAACP Legal Defense & Educational Fund, (Charles Ralston, argued), New York City, for Raymond Richardson Jr., et al.
 Aleta Arthur, Gilbert & Milom, John Norris, Hollins, Wagster & Yarbrough, Nashville, Tenn., for H. Coleman McGinnis, et al.
 Susan Spugeon, Christine A. Modisher, (argued), Asst. Attys. Gen., Office of the Atty. Gen., of Tennessee, Nashville, Tenn., for Ned McWherter, et al.
 Before MERRITT, MARTIN and JONES, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 The United States, an intervenor in an action seeking desegregation of public institutions of higher learning in Tennessee, appeals the district court's order granting attorney's fees against the United States in favor of original plaintiffs, individual intervening plaintiffs, and original defendants pursuant to 42 U.S.C. Sec. 1988 and 28 U.S.C. Sec. 2412(b).
 
 
 2
 The facts of this protracted litigation are set forth in this court's prior opinion, Geier v. Alexander, 801 F.2d 799 (6th Cir.1985). This action began with a complaint by several individuals seeking to enjoin the University of Tennessee from constructing a new facility to expand a non-degree granting program in Nashville. The plaintiffs argued that any extension of the Nashville site would hinder the desegregation process at predominantly black Tennessee A & I State University. The United States intervened as a plaintiff in the action two months after its filing pursuant to Title IX of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000h-2 (1982). The Richardson and McGinnis plaintiffs intervened shortly thereafter. The United States, after intervening, requested the district court to "order the state defendants to present a plan calculated to produce meaningful desegregation of the public universities of Tennessee," relief more expansive than sought by the original plaintiffs. Sanders v. Elington, 288 F.Supp. 937, 939 (M.D.Tenn.1968). After a long period of court ordered steps from 1968 to 1984 taken to eliminate the residual effects of de jure segregation in Tennessee's system of higher education, all the parties except the United States agreed to a comprehensive consent decree requiring numerous new desegregation programs throughout Tennessee's system of higher education. After more than fifteen years of litigation, the United States was the only party to object to the consent decree. In approving the consent decree, the district court found that less drastic remedial orders had failed to eliminate the residual effects of de jure segregation in Tennessee's higher education system and that the order approving the consent decree was designed to achieve the goal of "a system of higher education in Tennessee tax supported colleges and universities in which race is irrelevant, in which equal protection and equal application of the laws is a reality." Geier v. Alexander, 593 F.Supp. 1263, 1267 (M.D.Tenn.1984).
 
 
 3
 After the district court approved the consent decree, the United States filed a memorandum which challenged many of the programs contained in the proposed consent decree. The district court, after hearing oral argument on the government's objections, rejected each of them and entered the proposed consent decree. The government filed a timely appeal before this court from the district court's entry of the decree. In Geier v. Alexander, 801 F.2d 799 (6th Cir.1988), the United States challenged only a specific part of the consent decree which established a pre-professional program under which seventy-five qualified black sophomores were to be selected every year and guaranteed admission to one of the state's professional schools upon completion of his or her undergraduate work and satisfaction of the relevant school's admission standards. The government argued that the use of "racial quotas" to prefer minority students under the challenged program deprived non-minority students of equal protection. This court unanimously rejected the "racial quotas" argument of the government and affirmed the district court's entering of the consent decree.
 
 
 4
 Within thirty days after the district court entered the proposed consent decree in August of 1984, the private plaintiffs filed protective motions for attorney's fees and costs under 42 U.S.C. Sec. 1988. The motions asserted that the private plaintiffs were "prevailing parties" under Sec. 1988 and were entitled to fees and costs. In February of 1987, the district court asked the parties to brief the question whether Sec. 1988 fees and costs could be awarded against the United States, noting that the government's unsuccessful appeal had "caused a lot of people ... to spend a lot of time and effort and energy and incur a lot of costs." Soon thereafter, the Richardson and McGinnis intervenors as well as the State of Tennessee filed requests for attorney's fees and costs against the United States. On September 16, 1987, the United States filed a memorandum denying all fee liability based on Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), claiming that attorney's fees could not be awarded against it as a civil rights plaintiff unless its action was "frivilous, unreasonable and without foundation." The government argued that its opposition to the consent decree fell far short of the Christiansburg standard and, therefore, the government was not liable under Sec. 1988 for fees and costs.
 
 
 5
 On October 27, 1987, the district court concluded that Christiansburg did not apply in the case before the court and awarded fees against the government. On January 15, 1988, the United States filed a timely notice of appeal from the district court's order.
 
 
 6
 We review as a question of law whether attorney's fees and costs under Sec. 1988 may be awarded against the United States, an intervenor, who has objected to a consent decree approved by the district court, the substance of which the United States originally supported.
 
 
 7
 The district court correctly held that the Equal Access to Justice Act, 28 U.S.C. Sec. 2412(b) (1982), and 42 U.S.C. Sec. 1988, operate together to permit the district court in its discretion to award reasonable attorney's fees against the United States to a prevailing party.[1] The Supreme Court in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), stated that a "prevailing party" under Sec. 1988 is one who "succeeds on any significant issue which achieves some of the benefits plaintiffs sought in bringing suit." Id. at 433, 103 S.Ct. at 1939. The Supreme Court noted that the definition of a prevailing party is "a generous formulation that brings the plaintiff only across the statutory threshold." Id. at 433, 103 S.Ct. at 1939. In Hewitt v. Helms, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), the Court stated that a plaintiff must receive at least "some relief on the merits of his claim before he can be said to prevail." Id. at 2675. The court noted in Helms that:
 
 
 8
 It is settled law, of course, that relief need not be judicially decreed in order to justify a fee award under Sec. 1988. A law suit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment.... When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor. A party may obtain relief through judicial resolution or pronouncement or its equivalent. The focus is on the settling of some dispute which affects the behavior of the defendant towards the plaintiff. The equivalency doctrine is simply an acknowledgment of the primacy of the redress over the means by which it is obtained.
 
 
 9
 Helms, 107 S.Ct. at 2676.
 
 
 10
 Under Hensley and Helms, the private plaintiffs and the State of Tennessee are prevailing parties. Both were aligned against the United States when the United States challenged the consent decree. The private plaintiffs and the State of Tennessee prevailed against the attempt of the United States to restrict the scope of relief available to them under the consent decree. This circuit in Geier v. Alexander, 801 F.2d 799 (6th Cir.1986), settled the dispute between the private plaintiffs, the State of Tennessee and the United States over the scope and content of the consent decree in favor of the private plaintiffs and the State of Tennessee. Such favorable relief granted to the private plaintiffs and the State of Tennessee has enabled the original plaintiffs, private intervening plaintiffs, and the State of Tennessee to finally begin the implementation of a program to eliminate the residual effects of de jure segregation in Tennessee's higher education system--clearly a goal which Congress intended to accomplish under 42 U.S.C. Sec. 1983. As the Supreme Court noted in Hensley, the test to determine whether a party is a prevailing plaintiff and, therefore, can cross the statutory threshold of Sec. 1988 and receive attorney's fees "is a generous formulation." 461 U.S. at 433.
 
 
 11
 The legislative history of Sec. 1988 supports the district court's holding that attorney's fees can be assessed against the United States in the instant case. An examination of the legislative history of Sec. 1988 reveals that the overriding purpose and goal of Sec. 1988 was to provide fee awards to private citizens attempting to enforce the federal civil rights statutes. Charles v. Daley, 846 F.2d 1057, 1063 (7th Cir.1988). Section 1988 does not list with specificity those who should come under its fee award provisions. Id. at 1063; Kentucky v. Graham, 473 U.S. 159, 164, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985). We must look to the primary objectives Congress intended to implement through Sec. 1988 in order to determine those parties that properly should bear the burden of the fees provision. As the Seventh Circuit pointed out in Daley, "... [s]ection 1988's overriding goal was to reimburse with reasonable attorney's fees those who as 'private attorneys general' take it upon themselves to invoke and thereby invigorate the federal constitutional and statutory rights." Id. at 1063 (quoting the House Report on Section 1988); see also Charles v. Daley, 846 F.2d 1057, 1063 n. 8 (1988) (further quoting the House Report as stating that "the effective enforcement of civil rights statutes depends largely upon the efforts of private citizens ...," and the Senate Report as stating that "civil rights laws depend heavily upon private enforcement, and fee awards have proven an essential remedy if private citizens are to have meaningful opportunity to vindicate important congressional policies which these laws contain.").
 
 
 12
 In the instant case, the original private and intervening plaintiffs and the State of Tennessee, in the face of a government challenge, have attempted to enforce the federal civil right statutes through a judicially approved consent decree hammered out in successive stages through fifteen years of litigation. The United States originally intervened as a plaintiff in this civil rights suit, requested broad relief against the defendant, the State of Tennessee, and helped lay the foundation for the consent decree eventually entered into by the private litigants and the State of Tennessee. Fifteen years of litigation later, the United States now reverses its position. It challenges a validly and judicially approved consent decree, and further prolongs the litigation and costs to both the private plaintiffs and the State of Tennessee in an action where private plaintiffs had originally requested only injunctive relief and there now exists no money damages out of which the private plaintiffs or the State of Tennessee can adequately pay for attorney's fees. Congress clearly did not intend such a situation to result from the language of Sec. 1988. The financial burden necessitated by the parties in order to prevail against the government's attempt to restrict the scope of mutually agreed upon relief through a challenge to the consent decree should be born by the government under Sec. 1988. To reverse the district court and hold that the private plaintiffs and the State of Tennessee must bear the costs of the dispute with the government over the scope and content of the consent decree would certainly "chill a private citizen's activities in the assertion of his or her civil rights." Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).
 
 
 13
 The United States makes two arguments why it is not liable for attorney's fees under Sec. 1988. First, the government claims that it intervened as a plaintiff in the original civil rights lawsuit and should be held by the strict standards set forth in Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Christiansburg held that a plaintiff in a civil rights case is not liable for attorney's fees unless the action was "friviolous, unreasonable, or without foundation...." Id. at 421, 98 S.Ct. at 700. The United States claims that its action in challenging the consent decree does not meet the Christiansburg standard and the fee award by the district court was improper. Such an argument exalts form over substance. As the district court aptly stated:
 
 
 14
 The Christiansburg standards and statutes, congressional history, all indicate that it's designed to protect and to prevent the chilling of the assertion of rights by private attorney generals, by citizens trying to assert their constitutional rights and the reluctance of this court and all courts to award defendants fees against plaintiffs is to prevent the chilling of such rights. There's absolutely no element in this case where the awarding of fees against the United States could chill anybody's activity in the assertion of civil rights.
 
 The district court further stated that:
 
 15
 This Court might well find that the actions of the Justice Department in this case were frivolous, vexatious and without foundation. I have not made such a finding and won't make such a finding because it's unnecessary. The parties who applied for fees in this case are in fact, the prevailing party before the Sixth Circuit Court of Appeals.
 
 
 16
 We cannot allow the government to hide behind its nominal status as "plaintiff". In substance, the private litigants and the State of Tennessee have prevailed over the attempt by the government to prevent the establishment of a mutually agreed upon plan to eliminate the residual effects of de jure segregation in Tennessee's system of higher education, a purpose certainly in accordance with the federal civil rights statutes. Congress, in its passing of Sec. 1988, clearly stated that such "private attorney generals" should not bear the financial burden of pursuing their civil rights under the federal civil rights statutes. Charles v. Daley, 846 F.2d 1057, 1063 n. 8 (1988). The United States cannot undermine a clearly stated congressional purpose by clinging to its nominal status as a plaintiff and shifting the financial burden to the original private plaintiffs and the State of Tennessee, who in good faith agreed upon and entered into a consent decree. Regardless of the labels placed upon the parties, to bear the financial burden of litigating to protect a consent decree against government attack would chill citizens in the assertion of their civil rights. The United States cannot use its nominal status as an intervening plaintiff to hide behind the Christiansburg standard. As the district court stated, Christiansburg simply does not apply in this case.
 
 
 17
 Second, the United States argues that under Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), a court may not award Sec. 1988 fees against a party not held or alleged to be liable on the merits. The United States relies on the language in Graham stating that "... liability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, Sec. 1988 does not authorize a fee award against the defendant." Id. at 165, 105 S.Ct. at 3104. Graham involved plaintiffs who sued employees of the State of Kentucky in their personal capacity. The State of Kentucky refused to waive its Eleventh Amendment immunity and join the lawsuit, and refused to consent to defend the state employees. After its dismissal from the law suit, the State of Kentucky was a non-party to the substance of litigation that followed. It did not actively participate in the litigation and did not intervene in the litigation. Plaintiffs in Graham ultimately prevailed, not in the form of a judgment, but in the form of a settlement, and tried unsuccessfully to collect attorney fees under Sec. 1988 against the State of Kentucky. Graham does not preclude an award of fees against the United States as an intervenor in the circumstances of this case. As the Seventh Circuit pointed out in Daley, "the language relied upon by the intervenors is therefore specific to the facts of Graham and is not fairly interpreted as a definitive statement of Sec. 1988 liability in factually distinguishable cases." Charles v. Daley, 846 F.2d at 1066 n. 13. In the instant case, the United States actively and voluntarily intervened and then initiated a challenge to a consent decree entered into between the then existing parties and approved by the district court after fifteen years of litigation. The United States, as an intervenor in the instant case, may fairly be charged with the consequences of its actions to overturn the consent decree. Id. at 1067.
 
 
 18
 In conclusion, we affirm the district court. In a situation such as this where the United States intervenes under Title IX of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000h-2 (1982) to request relief beyond the injunction requested by the original private plaintiffs in order to compel the state defendants to present a plan calculated to produce meaningful desegregation of all the universities of Tennessee, where such broadened relief is eventually realized in the form of a consent decree voluntarily entered into between the original private plaintiffs and the State of Tennessee, where the United States reverses its original position and then challenges that consent decree and loses such a challenge, the private plaintiffs and the State of Tennessee are "prevailing parties" under Sec. 1988 and as such may receive attorney's fees from the United States.
 
 
 19
 MERRITT, Circuit Judge, dissenting.
 
 
 20
 The Department of Justice as intervening plaintiff, along with other plaintiffs some of whom were represented by the NAACP Legal Defense Fund, prevailed at the liability stage of this Tennessee higher education desegregation case. The defendants lost at this stage of the case. At the remedial stage and after long negotiation, the parties finally entered into a settlement agreement. The Department objected to one provision.
 
 
 21
 Neither this court nor the court below found that the objections of the Department to this provision were frivolous. The Department objected to one provision of the settlement agreement that appears to require that 75 Tennessee State University African-American students be automatically admitted to graduate programs at other state public universities without regard to the normal admissions process of these institutions. The Department asserted that this requirement of a "racial quota" constitutes "reverse discrimination." It lost on this point in both the court below and in this court.
 
 
 22
 Therefore, the important question presented to us is whether an intervening plaintiff (here the Department of Justice acting under its statutory authority to enforce the civil rights laws, 42 U.S.C. Sec. 2000e-6, and its authority to intervene in civil rights actions, 42 U.S.C. Sec. 2000h-2), who has not violated federal civil rights law and has not litigated frivolously, may nevertheless be required to pay attorney's fees to the other plaintiffs and to the defendants who prevailed on the remedial issue. The question of the liability of the United States for attorney's fees arises because 42 U.S.C. Sec. 2000e-5(k) makes the federal government liable for attorney's fees to the same extent as a private party.
 
 
 23
 The case requires us to determine what standard the courts should apply in civil rights litigation when awarding attorney's fees against an intervening plaintiff who is unsuccessful on one point but generally successful in the case--an intervening plaintiff who has not violated the civil rights of any other party. The court has concluded that fees should be assessed against such an innocent intervenor, whose statutory duty it is to enforce the civil rights laws, under the same standard applied to a losing defendant. The language of the fee shifting statute at issue here, 42 U.S.C. Sec. 1988, does not answer the question of intervenors because Congress did not take into account the role of intervenors in civil rights cases or the application of fee shifting to litigation among multiple parties with different interests on individual issues. The historical litigation model Congress had in mind was the standard two-sided lawsuit between a prevailing plaintiff and a defendant who has violated the plaintiff's civil rights. The fee-shifting portion of Sec. 1988 simply states:
 
 
 24
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C. 1681 et. seq.] or title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 25
 42 U.S.C. Sec. 1988.
 
 
 26
 My brethren strongly disagree with the position that the Department took on the one "reverse discrimination" remedial issue which it lost. But I can find no neutral principle, policy or rule regarding fee shifting expressed by the court or implicit in its opinion. Although we may disagree with positions taken by the Department of Justice on civil rights issues, neither our general philosophy nor our disagreement with the Department's views concerning affirmative action articulates a principle concerning fee shifting in multi-party litigation involving intervenors. My brethren apparently believe that a losing intervenor who has violated no one's civil rights and has made no frivolous claims--even an intervenor with a statutory duty to enforce the civil rights laws--should be assessed fees as though it were a losing defendant. Not only must the government pay the fees of the NAACP Legal Defense Fund as plaintiff, but it must also pay the fees of the defendants whose segregative educational policies constitute the civil rights violations that gave rise to the finding of liability in the first place.
 
 
 27
 Treating such an intervening plaintiff as a losing defendant for purposes of fee shifting cannot withstand analysis. If the NAACP Legal Defense Fund had intervened, as it frequently has done, and had lost on a remedial issue because its settlement position on college admissions, if adopted, would potentially violate the rights of Hispanics, women or another group, it would presumably have to pay the fees of all of its adversaries, including the defendants whose violations initiated the lawsuit. The position of the Legal Defense Fund, adopted in whole by the majority, will come back to haunt public interest groups in the future because such groups frequently intervene to assert unsuccessful positions at the liability or remedial stage of public law litigation.
 
 
 28
 Public law civil rights litigation, like complex, multi-polar, electrical circuits, often creates many points of light and many points of conflict among individuals and groups with different interests. Sometimes the conflicts that arise resemble conflicts in administrative rule making or in the legislative process more than conflicts typically seen in the standard, two-sided lawsuit. See Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev 1281 (1976).
 
 
 29
 Various nonminority employees, prisoners, school children, labor union members, voters, or welfare recipients may intervene to claim that the relief sought by various minority plaintiffs (African-Americans, Hispanics, women, aliens) would violate their individual or group rights grounded in civil rights, collective bargaining or other laws. Or one minority group may simply be pitted against another. Or an individual with interests different from other parties may intervene to contest the court's jurisdiction, a particular test of liability or a particular remedy. See, e.g., Reeves v. Harrell, 791 F.2d 1481 (11th Cir.1986), cert. denied, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987) (non-minority employees intervened claiming that numerical relief sought by minority plaintiffs would violate their rights); Richardson v. Alaska Airlines, Inc., 750 F.2d 763 (9th Cir.1984) (intervening union opposed consent decree reached by plaintiff employee and defendant employer in Age Discrimination in Employment Act suit on grounds that it violated collective bargaining rights); Airlines Stewards & Stewardesses Ass'n Local 550 v. Trans World Airlines, Inc., 630 F.2d 1164 (7th Cir.1980), aff'd sub nom. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (intervenor union challenged jurisdiction of district court to approve settlement agreement in sex discrimination case because timely charges not filed with the EEOC); United States v. Board of Education of Waterbury, Conn., 605 F.2d 573 (2nd Cir.1979) (plaintiff-intervenor protecting Hispanics' interest in formulation of school desegregation remedy awarded fees); Zamlen v. City of Cleveland, 686 F.Supp. 631 (N.D. Ohio 1988) (unsuccessful women applicants for fire fighter positions challenged adjustment of test results made under affirmative action plan for hiring of African-Americans and Hispanics); Baker v. City of Detroit, 504 F.Supp. 841 (E.D.Mich.1980), aff'd sub nom. Bratton v. City of Detroit, 704 F.2d 878 (6th Cir.1983), rev'd on other grounds, 712 F.2d 222 (6th Cir.1983) (minority employees intervened to oppose a suit brought by non-minority employees challenging a voluntary affirmative action program).
 
 
 30
 In light of the complexity of public law litigation and the room for conflict among various parties and intervenors, we should avoid chaos in fee shifting by adopting a relatively straightforward principle rooted in equity--a principle of reciprocity: Prevailing plaintiffs are entitled to an award but only from losing defendants whose conduct violates their civil rights or from parties who have interjected frivolous motions or arguments. Where no frivolous conduct is found, only those who violate the law should pay the attorney's fees of plaintiffs whose rights are violated. Parties who have not violated plaintiff's legal rights should not be required to pay plaintiff's attorney's fees.
 
 
 31
 If fee shifting is imposed on parties who have not violated a "prevailing party's" substantive legal rights, I can see no way to create neutral or objective principles of law in this area. The process could easily degenerate into the exercise of a standardless discretion which allows favoritism and visceral reactions to govern. The principle of reciprocity alluded to above goes a long way toward solving this problem. It anchors fee awards to liability for civil rights violations.
 
 
 32
 This principle of reciprocity is amply supported by law already on the books. The Supreme Court has said that, "when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 418, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978). "[L]iability on the merits and responsibility for fees go hand in hand." Kentucky v. Graham, 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985). The Court has held that no fees may be awarded to a plaintiff who has won the right to a new trial because the plaintiff has not yet established that the defendant violated his civil rights. Hanrahan v. Hampton, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). A partially guilty defendant is required to pay attorney's fees only for those portions of the case on which plaintiff succeeded in establishing civil rights liability. Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Congress would not have "countenanced assessing fees against a defendant absent any showing of discrimination." Grubbs v. Butz, 548 F.2d 973, 976 (D.C.Cir.1976).
 
 
 33
 Finally, and most importantly, the principle of reciprocity in fee shifting best serves the basic purposes of civil rights litigation: (1) it would deter violations of civil rights laws by encouraging meritorious claims and (2) it would insure that all competing interests are considered.
 
 
 34
 If attorney's fees are awarded against the innocent intervenor--whether a plaintiff or a defendant--she will be deterred from entering the case to protect her interest, even if that interest is protected by the Constitution. She will be deterred from asserting claims that may in the end succeed. And such a policy would clearly deter the agency that Congress has given the duty to enforce the civil rights laws--the Department of Justice--from intervening to insure that the interests of groups not represented in bipolar litigation are not forgotten.
 
 
 35
 The rule adopted by my brethren sacrifices all of these vital concerns. And it threatens to generate evils of its own, by encouraging intervenors to delay and to protract litigation in order to avoid the risk of liability for fees--to wait until after the liability issues are resolved to file their claims because losing plaintiffs are not ordinarily liable for attorney's fees, except when their claims are "frivolous."
 
 
 36
 Today we have approved the award of attorney's fees to a guilty defendant at the expense of an innocent intervenor who sought to vindicate Constitutional rights. The majority's decision is flawed both in its reasoning and in its result. Therefore, I respectfully dissent.
 
 
 
 [1]
 28 U.S.C. Sec. 2412(b) constitutes a waiver of the government's sovereign immunity. The Equal Access to Justice Act states in relevant part:
 The United States shall be liable for [reasonable fees and expenses of attorneys] to the same extent that any other party would be liable ... under the terms of any statute which specifically provides for such an award.
 28 U.S.C. Sec. 2412(b). 42 U.S.C. Sec. 1988 states in pertinent part:
 In any action or proceeding to enforce a provision of Secs. 1981, 1982, 1983, 1985, and 1986 of this title, Title IX of Public Law 92-318, or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of its costs.