914 F.2d 676
 62 Ed. Law Rep. 910
 Jake AYERS, Sr., et al., Plaintiffs,
Jake Ayers, Jr., Bennie G. Thompson, Leola Blackmon, Lillie
Blackmon, Louis Armstrong, Darryl C. Thomas, and
Leon Johnson, Plaintiffs-Appellants,
and
United States of America, Intervenor-Appellant,
v.
William ALLAIN, Governor, State of Mississippi, et al.,
Defendants-Appellees.
 No. 88-4103.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 28, 1990.
 
 Robert Pressman, Center of Law & Educ., Cambridge, Mass., Alvin O. Chambliss, Jr., Oxford, Miss., for plaintiffs.
 Nathaniel Douglas, John R. Moore, Levern M. Younger, Franz R. Marshall, Zita Johnson-Betts, Attys., U.S. Dept. of Justice, Civ. Rights Div., Educ. Opportunities Litigation Section, Linda F. Thome, Jessica Dunsay Silver, Attys., Appellate Section, Civ. Rights Div., Dept. of Justice, Roger Clegg, Deputy Asst. Atty. Gen., Washington, D.C., for U.S.
 Mike Moore, Atty. Gen., William F. Goodman, Jr., Paul Stephenson, Ed Davis Noble, Jr., Jackson, Miss., for defendants-appellees.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before GOLDBERG, GEE, POLITZ, KING, JOHNSON, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHE, WIENER and BARKSDALE, Circuit Judges.[1]
 DUHE, Circuit Judge:
 
 
 1
 This is an appeal from the dismissal of a lawsuit challenging the racial identity of institutions of public higher education in the State of Mississippi. Ayers v. Allain, 674 F.Supp. 1523 (N.D.Miss.1987) (Ayers I ). A panel of this Court reversed and remanded, Ayers v. Allain, 893 F.2d 732 (5th Cir.1990) (Ayers II ), and rehearing en banc was granted, Ayers v. Allain, 898 F.2d 1014 (5th Cir.1990). Finding that the record makes clear that Mississippi has adopted and implemented race neutral policies for operating its colleges and universities and that all students have real freedom of choice to attend the college or university they wish, we affirm.
 
 A. History
 
 2
 A detailed outline of the prior history of this case may be found in the opinions of the district court and the panel majority.[2] This is a class action filed in 1975 by black citizens of Mississippi against the Governor of Mississippi, the Board of Trustees of State Institutions of Higher Learning and its members, five historically white institutions of higher learning and their chief administrative officers, the State Department of Education, and the State Superintendent of Education.[3] The plaintiffs alleged that the defendants were maintaining and perpetuating a racially dual system of higher education in violation of the Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. Secs. 1981, 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d et seq. The United States intervened as plaintiff under 42 U.S.C. Sec. 2000h-2 and alleged violations of the Fourteenth Amendment and Title VI. The plaintiffs sought injunctive relief requiring the defendants to conform Mississippi's system of higher education to the constitutional and statutory mandates. The lawsuit remained under the supervision of a three-judge court for ten years and was transferred to the district court for the Northern District of Mississippi in 1985.
 
 
 3
 The district judge ordered the case tried to the court. The plaintiffs directed their complaint to the following components of higher education in Mississippi: student admissions standards and enrollment, university staff composition, institutional mission, provision and maintenance of facilities, allocation of financial resources, curricular offerings and placement of programs, operation of branch programs, allocation of land grant functions, and the composition of the Board of Trustees and its staff. The plaintiffs alleged that the vestiges of a dual, racially discriminatory system of higher education persisted in each of the components. They identified the institutions of higher learning in Mississippi as either historically black institutions or historically white institutions[4] as follows:
 
 
 4
 The defendants alleged that the Board and each institution maintained good-faith, nondiscriminatory and nonracial admissions and operational policies with respect to students, faculty, and staff, and that the state's duty to disestablish state-imposed segregation extended no further. The defendants also alleged that any racial identifiability of the institutions could not be attributed to state policies.
 
 
 5
 The district judge conducted a five-week trial and issued detailed and well reasoned findings of fact and conclusions of law. Ayers I, 674 F.Supp. at 1526-63. He stated that the law clearly imposed upon Mississippi an affirmative duty to dismantle its racially dual system of education, but that the scope of the duty was not so broad in the context of higher education as in primary and secondary education. He held that Mississippi was not required to achieve a certain level of racial balance in the various components of higher education, but rather was only obliged to adopt and implement good-faith, race-neutral policies and procedures. He relied upon the reasoning of Alabama State Teachers Ass'n v. Alabama Public School and College Auth., 289 F.Supp. 784 (M.D.Ala.1968) (three-judge court), aff'd, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) and Bazemore v. Friday, 478 U.S. 385, 407-09, 106 S.Ct. 3000, 3012-13, 92 L.Ed.2d 315 (1986) (White, J., concurring), in which rules governing primary and secondary education were distinguished on the basis of a state's inability to designate college attendance zones and the broader choices available to students in the context of higher education. Ayers I, 674 F.Supp. at 1551-54. The judge's findings and conclusions accorded with this construction of the law, and the plaintiffs have challenged some of those findings and conclusions on appeal. A summary of the district court's challenged findings and conclusions follows:
 
 
 6
 The Board of Trustees. The Board of Trustees is charged with the management and control of the institutions of higher learning in Mississippi and consists of thirteen members appointed by the governor. No black was appointed to the Board until 1972, but since 1972 three additional blacks have been appointed and three blacks currently serve. With respect to the Board staff, of the twenty-three persons responsible for overseeing the day-to-day operations of the Board, six are black, and of the fifty staff members responsible for overseeing the guaranteed student loan program, seventeen are black. The district court concluded that the Board had adopted racially neutral hiring policies with respect to its staff. Id. at 1550, 1563.
 
 
 7
 Use of ACT scores in student admissions. Shortly after James H. Merideth applied for admission to the University of Mississippi, the Board adopted certain policies to govern admissions to institutions of higher education in Mississippi.[5] Among these policies was the requirement that all students applying for admission take a test prepared by the American College Testing Program (ACT). The ACT requirement continues to this day. In the mid-1970's the historically black institutions did not require a minimum ACT score for admission, while the historically white schools generally required a minimum score of 15 but also provided qualified admission of students with lower scores. In the latter half of the 1970's the Board sought to address concerns about the underpreparation of incoming students, and beginning in 1977 the Board instituted a new policy declining the admission of any student who did not achieve an ACT score of 9. The Board did not adopt high school grades as an admissions component. During subsequent years the Board granted permission to certain historically white institutions to admit on a probationary or exceptional basis students with scores of less than 15. The Board also granted permission to certain historically black institutions to raise the minimum ACT score while preserving the right to admit on an exceptional basis students who fell below the minimum. Id. at 1530-34. The current admissions practices are:
 
 
 8
 (1) All incoming students are required to take the secondary school "core curriculum". In grades 9 through 12 students are required to have earned a certain number of units in English, mathematics, science, social science, and an elective course. A particular grade point average is not required. Exemptions from the core curriculum requirement are possible, and the exemption policies are more liberal for admission to the historically black institutions.
 
 
 9
 (2) All Mississippi applicants under 21 are required to take the ACT, and no student who scores below 9 is eligible for admission as a first-time freshman.[6] Within these guidelines the individual institutions maintain different admissions standards. The Board requires a minimum score of 15 for automatic admission to the historically white institutions, although it permits enrollment of up to fifty talented or high-risk students (students presenting a high risk of academic failure) per year per institution with scores below 15. Automatic admission to Mississippi University for Women requires a score of 18, although students with lower scores can be admitted either on an exceptional basis or by achieving a certain grade point average. Automatic admission to Jackson State University, Alcorn State University, and Mississippi Valley State University requires a score of 13, with enrollment permitted for students with lower scores who, for example, are identified as high-risk or talented or who achieve a certain grade point average.
 
 
 10
 On average the ACT scores of Mississippi black students are lower than those of Mississippi white students. However, according to the Deputy Superintendent of Education, ACT scores rise measurably as more students choose to take the core curriculum and a smaller percentage of blacks choose to take that curriculum. Very few black applicants, if any, are denied admission to Mississippi universities as first-time freshman for failure to achieve the minimum ACT score. Id. at 1535-36.
 
 
 11
 (3) Mississippi has numerous public junior colleges which permit automatic enrollment to high school graduates. Students who fail to achieve either the required ACT score or who have not satisfied the core curriculum requirement are permitted to transfer from the junior colleges to the public universities after the completion of 24 hours with a C average. Some students with low ACT scores are permitted to transfer with as few as 15 hours. Because of the transfer policy, no applicant is denied admission for failure to achieve a particular ACT score, but admission at most is deferred.
 
 
 12
 The trial judge concluded that the current admissions policies and procedures, including the use of the ACT, were not adopted for a racially discriminatory purpose and are reasonable, educationally sound, and racially neutral. Nearly all black students who applied to historically white universities in the fall of 1986 were accepted. However, the ACT requirement was initially adopted because of its adverse effects on blacks, but admissions policies have changed in the ensuing 25 years. In particular, he concluded that the minimum ACT score of 9 was not adopted in 1976 for discriminatory purposes, but in order to address the problem of underpreparation of incoming freshman. In addition, the district court found adequate justification for the Board's decision not to adopt high school grades as a component of the admissions requirements; grade inflation and the lack of comparability among Mississippi's high schools justified the Board's policy. Id. at 1554-57.
 
 
 13
 Off-campus centers. The plaintiffs alleged that three off-campus centers competed for students with certain historically black institutions:
 
 
 14
 (1) In 1966 three extension centers were consolidated to form the Mississippi University Center, located in Jackson near Jackson State University. In 1972 the Board assigned management responsibilities to the University of Mississippi, Mississippi State University, and Jackson State University, and gave the center degree-granting status.
 
 
 15
 (2) In 1962 the Board granted the University of Southern Mississippi permission to establish a resident center in Natchez, near Alcorn State University. The Plan of Compliance adopted by the Board in 1974[7] called for the joint participation of the two universities at the Natchez Center, and presently the University of Southern Mississippi offers only noncredit extension courses at the center.
 
 
 16
 (3) In 1952 the Board recognized a resident center at Vicksburg, and in 1980 approved a consortium arrangement between Alcorn State University and Mississippi State University for activities at the center. Id. at 1541-43.
 
 
 17
 Institutional mission. In 1981 the Board issued a document entitled "Mission Statements." Under the statements the public universities were classified as either "comprehensive," "urban," or "regional."
 
 
 18
 Comprehensive Regional
 
 
 19
 Mississippi State University Alcorn State University
 
 
 20
 University of Mississippi Delta State University
 
 
 21
 University of Southern Mississippi Mississippi University for Women
 
 Mississippi Valley State University
 Urban
 Jackson State University
 
 22
 The "comprehensive" designation implies a greater number and higher level of degree offerings, the "urban" designation oriented the institution toward service to the urban community, and "regional" signifies course offerings generally limited to undergraduate instruction. One witness testified that every state but one assigns missions to its universities. Such assignments are required by limited financial resources. Id. at 1538-40.
 
 
 23
 The judge concluded that the 1981 mission designations were not motivated by a discriminatory purpose but rather a need to conserve scarce educational resources. The state was under no duty to use the designations as a device to maximize racial integration. The designations were rationally based on sound educational policies. Id. at 1560-61.
 
 
 24
 Disparities in funding and programs. Differences exist among the institutions with respect to the relative quality and quantity of programs offered, library volumes, and number of faculty with doctorates and degrees from major research institutions. However, these differences do not correlate with historical racial configuration, but rather with the comprehensive or noncomprehensive designation of a given institution. In particular, no racial pattern exists in program quality among noncomprehensive institutions. Id. at 1541.
 
 
 25
 The plaintiffs alleged that disparities existed in land grant activities between Mississippi's two land grant universities, Alcorn State University and Mississippi State University. Financial allocations for agricultural instruction at the two universities are educationally sound, reasonable, and unaffected by racial considerations. Agricultural research is heavily concentrated at Mississippi State University, which conducts research through the Mississippi Agricultural and Forestry Experimental Station. Since 1972, however, Alcorn State University has conducted a branch experimental station and since 1971 has received limited legislative appropriations for agricultural research. The judge also found that the Mississippi Cooperative Extension Service, an off-campus, separately funded arm of Mississippi State University, operates a branch at Alcorn State University. He concluded that funds for land grant instruction were allocated according to a racially neutral funding formula, and that disparities in land grant programs were not caused by any discriminatory motive. Id. at 1543-46.
 
 
 26
 With respect to funding, the Board allocates a general support appropriation among the universities according to a funding formula. The formula attempts to calculate costs of instruction, the percentage of total need which the costs of instruction represent, and the funds each institution is expected to generate for itself. Institutional mission is an important element in calculating instruction costs, total need, and expected self-generated funds.[8] The funding formula does not treat the predominantly black institutions inequitably. Mississippi Valley State University benefitted substantially from being grouped with the other regional universities for purposes of calculating instruction costs, and Jackson State University also benefitted from being grouped with the University of Southern Mississippi. On those occasions when the Board departed from the formula, the predominantly black institutions have benefitted. The district court concluded that differences in funding levels are not attributable to race but to legitimate educational distinctions among the institutions. Id. at 1546-48, 1562.
 
 
 27
 With respect to facilities, from 1970 to 1986 the predominantly black institutions received a greater percentage share of appropriations for new construction than the percentage of system-wide enrollment those institutions represented. In comparing the amount of functional space available per full-time equivalent student,[9] the predominantly black schools rank second, third, and seventh among the eight universities. The district court found no correlation between the racial identity of the institutions and the quality of the facilities, and concluded that the distribution of funds for capital improvements clearly evinced a good-faith affirmative effort to provide adequate facilities at the historically black institutions. Id. at 1548-50, 1562.
 
 B. The Duty of the State
 
 28
 It is necessary first to determine the scope of Mississippi's duty to remedy the effects of past de jure discrimination. There is no dispute that, when the Supreme Court decided Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), Mississippi operated a racially dual system of public higher education. See Merideth v. Fair, 305 F.2d 343, 350 n. 7 (5th Cir.1962); Ayers I, 674 F.Supp. at 1528-30. Mississippi was therefore constitutionally required to eliminate invidious racial distinctions and dismantle its dual system. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 22, 91 S.Ct. 1267, 1277, 1279, 28 L.Ed.2d 554 (1971); Brown v. Board of Education, 349 U.S. 294, 300-01, 75 S.Ct. 753, 756-57, 99 L.Ed. 1083 (1955) (Brown II ). The precise constitutional obligation of a state with respect to its system of higher education, however, is not so clearly defined as in cases involving primary and secondary education. In the latter cases school authorities have been charged to eliminate all vestiges of state-imposed segregation, Milliken v. Bradley, 433 U.S. 267, 289-90, 97 S.Ct. 2749, 2761-62, 53 L.Ed.2d 745 (1977); Swann, 402 U.S. at 15, 91 S.Ct. at 1275-76, and "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch," Green v. County School Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). In two cases outside the context of primary and secondary education, a different standard has been employed. See Bazemore v. Friday, 478 U.S. 385, 408, 106 S.Ct. 3000, 3012-13, 92 L.Ed.2d 315 (1986) (White, J., concurring);[10] Alabama State Teacher Ass'n v. Alabama Public School and College Auth., 289 F.Supp. 784 (M.D.Ala.1968), aff'd per curiam, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969). In these cases the governing authorities were deemed to have satisfied their constitutional obligation by discontinuing prior discriminatory practices and adopting and implementing good-faith, race-neutral policies. Bazemore, 478 U.S. at 408, 106 S.Ct. at 3012-13; Alabama State Teachers, 289 F.Supp. at 789-90. This Court must therefore determine whether Mississippi's duty to dismantle its prior system of de jure segregation in higher education requires more than the adoption and implementation of good-faith, race-neutral policies and procedures in the components of higher education under review.
 
 
 29
 We first note that the issues in this lawsuit bear on the defendants' fulfillment of their duty under the Constitution and relevant laws. Neither this Court nor the district court addresses the specific remedies which the defendants must or might undertake in the future. Nevertheless, because the duty outlined in Bazemore is essentially a remedial duty and describes, in a general manner, the scope of mandatory remedial action, it is occasionally necessary to refer to specific remedies for the sake of illustration.
 
 
 30
 In Green the Supreme Court expressed its distrust of ostensibly race-neutral policies in primary and secondary school desegregation plans. The Court determined that a school board's adoption of a plan under which students were annually permitted to choose to attend one of the two schools in the county "fail[ed] to provide meaningful assurance of prompt and effective disestablishment of a dual system...." Green, 391 U.S. at 438, 88 S.Ct. at 1694. The Court noted that in the three years prior to its decision no white child had chosen to attend the all-black school and that 85% of the black children continued to attend that school. The Court concluded:
 
 
 31
 We do not hold that "freedom of choice" can have no place in [a desegregation plan]. * * * Rather, all we decide today is that in desegregating a dual system a plan utilizing "freedom of choice" is not an end in itself. * * * Although the general experience under "freedom of choice" to date has been such as to indicate its ineffectiveness as a tool of desegregation, there may well be instances in which it can serve as an effective device. Where it offers real promise of aiding a desegregation program to effectuate conversion of a state-imposed dual system to a unitary, non-racial system there might be no objection to allowing such a device to prove itself in operation. On the other hand, if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, "freedom of choice" must be held unacceptable.
 
 
 32
 Id. at 440-41, 88 S.Ct. at 1695-96 (footnotes omitted). The Court therefore dismissed the "freedom of choice" plan before it as ineffective while recognizing that in other circumstances choice could serve as an effective device, particularly when other methods of achieving desegregation are not available.
 
 
 33
 The role of choice in higher education under current law can be discovered only somewhat more obliquely from the few cases that have addressed the issue. In Alabama State Teachers a black teachers' association sued a state body that governed public education in Alabama, seeking to enjoin the construction of a four-year college at Montgomery. The plaintiffs argued that in planning the new college the defendant did not "maximize desegregation." The court held that although a state has an affirmative duty to dismantle a racially dual system of higher education, the scope of the duty did not extend so far in higher education as in primary and secondary education. The court believed the state's duty was satisfied by dealing with admissions, faculty, and staff in good faith. 289 F.Supp. at 789-90.
 
 
 34
 Higher education is neither free nor compulsory. Students choose which, if any, institution they will attend. In making that choice they face the full range of diversity in goals, facilities, equipment, course offerings, teacher training and salaries, and living arrangements, perhaps only to mention a few. From where legislators sit, of course, the system must be viewed on a statewide basis. In deciding to open a new institution or build a branch or expand an existing institution, and in deciding where to locate it, the legislature must consider a very complicated pattern of demand for and availability of the above-listed variables, including, also, impact on the dual system. We conclude that in reviewing such a decision to determine whether it maximized desegregation we would necessarily be involved, consciously or by default, in a wide range of educational policy decisions in which courts should not become involved.
 
 
 35
 Id. at 788. The court recognized that Green had cast doubt on the viability of "freedom of choice" plans in primary and secondary schools. The court believed, however, that Green did not dictate the same result for higher education, because freedom to choose a college, unlike freedom to choose a primary or secondary school, helps to perform the important function of fitting a student to the right school. Id. at 790.
 
 
 36
 A few years later another three-judge court reached the opposite result. Norris v. State Council of Higher Education for Virginia, 327 F.Supp. 1368 (E.D.Va.), aff'd, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971). Black faculty and students at Virginia State College sought to enjoin the expansion of a predominantly white college from a two-year to a four-year institution. The lawsuit challenged the constitutionality of an appropriation act providing for the expansion, an act which it was alleged perpetuated a racially dual system of higher education. The court concluded that the purpose and effect of the expansion was to provide a four-year college for white students, that the appropriation act served to perpetuate a racially dual system of higher education, and that the act therefore violated the Fourteenth Amendment. Id. at 1370-71. The court noted that while Green addressed desegregation in public primary and secondary schools, "it defined a constitutional duty owed as well to college students." Id. at 1373. The court believed only the means of eliminating discrimination in the two contexts differed. Id.
 
 
 37
 Alabama State Teachers and Norris announced opposite conclusions on the issue of Green 's applicability to higher education, and both decisions were affirmed on appeal to the Supreme Court. The awkwardness is explained by the underlying facts and conclusions in the two opinions. The disposition in Alabama State Teachers is entirely dependent on the conclusion that Green 's rejection of certain "freedom of choice" plans in primary and secondary schools does not dictate the same result in the college setting. It is therefore doubtful the Supreme Court could have upheld the denial of the injunction without giving sanction to the standard announced by the trial court. This is particularly so in view of the fact that the Supreme Court had the benefit of Justice Douglas' dissent, in which he points out squarely that the trial court had drawn a distinction between levels of education which had not been drawn in prior decisions. Alabama State Teachers Ass'n v. Alabama Public School and College Auth., 393 U.S. 400, 401, 89 S.Ct. 681, 682, 21 L.Ed.2d 631 (1969) (Douglas, J., dissenting); see Norris, 327 F.Supp. at 1378 n. 8 (Hoffman, J., dissenting in part). In Norris, on the other hand, the granting of the injunction was based on a finding which warranted the injunction regardless of the standard employed. The lower court found that "the purpose and effect of [the college's] escalation is to provide a four-year college for white students who reside nearby." Norris, 327 F.Supp. at 1371. This finding put the defendants in clear violation of their duty to eliminate invidious racial distinctions. The decision was therefore properly affirmed on appeal, and the lower court's attempts to distinguish Alabama State Teachers and adopt Green were in no way essential to the resolution of the case.
 
 
 38
 In Bazemore the Supreme Court further clarified the duty of a state outside the context of primary and secondary education. The School of Agriculture and Life Sciences at North Carolina State University operated an extension service that educated farmers in agriculture, organized and operated clubs in home economics and 4-H, and conducted citizens' organizations for community resource development. The extension service had formerly maintained racially segregated branches, but the branches were merged in 1965. Employees, services recipients, club members, and parents sued the president and other officials of the university alleging racial discrimination in employment and services related to the extension service. The record indicated generally that the 4-H and homemaker clubs remained clearly racially identifiable. The district court nevertheless found no evidence of any discrimination after the merger of the two branches and the opening of the clubs to all eligible persons regardless of race, and the adoption of race neutral policies regarding staff.
 
 
 39
 The Supreme Court held that the case presented no current violation of the Fourteenth Amendment, because the extension service had discontinued its prior discriminatory practices and had adopted a wholly neutral admissions policy. Bazemore, 478 U.S. at 408, 106 S.Ct. at 3012-13. The Court gave particular attention to the choices available to those who sought to join the clubs, noting that the choice of a club was entirely voluntary, a person was not compelled to join a club, and no one had the authority to deny a person the right to join a club he or she wished to join. Id. The Court noted that while Green required greater measures in desegregating primary and secondary schools, it did not govern the voluntary associations operated by the extension service. "[H]owever sound Green may have been in the context of the public schools, it has no application to this wholly different milieu." Id.
 
 
 40
 It might appear that Bazemore is at odds with Green, because Bazemore approved a desegregation plan substantially similar to the plan rejected in Green. The two decisions do not support such exclusive readings, however. Green did not invalidate all "freedom of choice" plans, but rather concluded that such a plan alone in the case before the Court did not effectively meet the state's obligation to desegregate its primary and secondary schools. The Court repeatedly emphasized that there was no universal answer, no one plan, that would achieve the goal of desegregation in every case, and that the availability of alternative methods would bear on the effectiveness of a given plan. "[I]n desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself.... '[I]t is only a means to a constitutionally required end--the abolition of the system of segregation and its effects. If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end.' " Green, 391 U.S. at 440, 88 S.Ct. at 1695 (quoting Bowman v. County School Board, 382 F.2d 326, 333 (4th Cir.1967) (Sobeloff, J., concurring)). Bazemore is therefore not at odds with Green. Bazemore simply provides an instance, anticipated by Green, of freedom of choice proving itself in operation.
 
 
 41
 While the two decisions are not at odds, a court presented with a freedom-of-choice plan must nevertheless determine whether the plan must be rejected under Green or may be approved under Bazemore. A decision of the Sixth Circuit illustrates the difficulty in drawing the line. See Geier v. Alexander, 801 F.2d 799 (6th Cir.1986). Tennessee had formerly maintained a racially segregated university system, and several individuals sued the state to prevent the construction of a non-degree granting center close to a predominantly black university. The scope of the lawsuit expanded to include desegregation of the public universities generally, and after many years of litigation the parties agreed to a consent decree. The United States objected to a provision of the decree which required the defendants to select 75 black students yearly for entry into professional programs. The United States argued, among other things, that the provision violated the equal protection rights of non-minority students, because under Bazemore a state has no obligation to remove the vestiges of prior discrimination in higher education but need only establish neutral admissions standards.
 
 
 42
 The Sixth Circuit held that the district court was entitled to impose affirmative remedies to remove the vestiges of prior discrimination and that the provision at issue contained a permissible remedy. The court believed that Green, not Bazemore, governed the issue of desegregation in public universities, and that the United States had "read[ ] too much into Bazemore." The court stated that while no one is compelled to enter a profession, if he wishes to do so he must pursue the appropriate course of study at a university. The court also stated that an advanced education is more valuable than the services provided by the 4-H and homemaker clubs under review in Bazemore, and that the state's interest in educating its young people therefore required the application of Green. Id. at 804-05.
 
 
 43
 We disagree with both the holding and reasoning in Geier. The Geier court applied the Green standard after distinguishing Bazemore, a case which in turn had distinguished Green. We believe the Sixth Circuit incorrectly performed this awkward legal arithmetic. Bazemore relies entirely on the choices available to persons who wished to join the clubs under review. The Bazemore opinion does not address the character of the programs or the importance of the clubs to the communities they serve, nor does it make any distinction between supplementary education and the conferral of degrees. It states only that the choices available to potential club members serve to distinguish the clubs from primary and secondary schools. It therefore makes little sense why other factors, which formed no part of the reasoning, should serve to distinguish the decision and consequently require a university to submit to the Green standard.
 
 
 44
 If Bazemore had not relied on choice alone it would nevertheless be difficult to make the kind of distinctions that the Geier court made among the different offerings of a public university. If the law demanded a different obligation of the state with respect to different university offerings, a university could never be judged as a whole. One portion of a given lawsuit directed at "Bazemore-type" programs would be resolved by different standards and call for different remedies than another portion directed at "Green-type" programs. Distinctions would be made between and among continuing education, professional curricula, research fellowships, athletics, and the like. Such distinctions would be based on the doubtful premise that a state has a different constitutional obligation with respect to separate university offerings.
 
 
 45
 It would be even more difficult to determine on what bases these different obligations could be allotted, and in this regard Geier is particularly unsatisfactory. The notion that a person must pursue the appropriate course of university study in order to enter a profession does not mean that a person has no choice but to enter a university, and does not equate an aspiring professional to a student at a primary or secondary school. The comparison to primary and secondary schools is valid only if the state somehow has a compelling interest in assuring that persons enter professions. The court's statement that membership in an extension service is valuable but cannot be compared to the importance of education ignores the fact that the 4-H and home economics divisions of the extension service in Bazemore were engaged in the education of their club members. See Bazemore, 478 U.S. at 389, 106 S.Ct. at 3003 (Brennan, J., concurring), 410 (Brennan, J., dissenting in part). The root problem with the Geier court's reasoning was correctly identified by the panel majority in the present case as an improper "hierarchy of values." Ayers II, 893 F.2d at 745. Such a hierarchy is purely subjective, impossible to apply, and not founded on the Constitution.
 
 
 46
 We believe that Bazemore and Alabama State Teachers provide the proper standard to govern Mississippi's efforts to disestablish prior de jure segregation in its universities. Universities are not simply institutions for advanced education. They differ in character fundamentally from primary and secondary schools, and the duty outlined in Green cannot bring about the disestablishment of prior de jure segregation in higher education except at the expense of the very goals Green sought to achieve. The most obvious differences concern attendance and the choice of institution. An entire range of remedial options available for the desegregation of the public primary and secondary schools is not available in the context of higher education simply because attendance at a university is voluntary and persons may choose which of several universities to attend. This is not merely a problem of discovering the appropriate "means" of eliminating discrimination as the Norris court stated. Norris, 327 F.Supp. at 1373. Green acknowledged that the viability of a "freedom of choice" plan would be dependent in part on the number of effective remedial alternatives. Green, 391 U.S. at 439-41, 88 S.Ct. at 1694-96. The Court twice mentions zoning as such an alternative. Id. at 441, 442, 88 S.Ct. at 1696. It hardly needs mention that remedies common to public school desegregation, such as pupil assignments, busing, attendance quotas, and zoning, are unavailable when persons may freely choose whether to pursue an advanced education and, when the choice is made, which of several universities to attend.
 
 
 47
 A second difference concerns the uniformity of primary and secondary education as contrasted with the diversity of a university education. See Alabama State Teachers, 289 F.Supp. at 788. The idea of diversity is crucial to the task of assigning the proper duty to the state of Mississippi, because diversity raises questions of choice discussed in both Green and Bazemore. The central difficulty is that Green would impose a regime of imperatives and uniformity on what are in essence diverse institutions, and in so doing would destroy the choices available to both black and white citizens of Mississippi. For example, consistent with Green the plaintiffs have asked for the merger of branch centers with nearby historically black universities, enhancement of programs at historically black universities to bring them to parity with programs at historically white universities, redesignation of the missions of the historically black universities, and the termination of certain programs so that those programs will be offered only at the historically black universities. To the extent these remedies attempt to force a potential student to attend a particular university, they reduce that student's choice among institutions. To the extent these remedies impose uniformity among the eight institutions, they render the student's choice valueless and return to the unacceptable "separate but equal" principle. The district court found that approximately 30% of all black college students attending four-year colleges in the state attend one of the comprehensive universities. Ayers I, 674 F.Supp. at 1562. Imposing remedies argued for by plaintiffs under Green would force some of those students, who presently enjoy the benefits of a comprehensive university, either to look to another institution or forgo their education. Equal protection is not served by closing doors which this country and this circuit in particular have taken great pains to open. If an aspiring student may freely choose to attend college, if he may freely choose among all institutions in the state, and if no authority exists to deny him the right to attend the institution of his choice, he is done a severe disservice by remedies which, in seeking to maximize integration, minimize diversity and vitiate his choices. Bazemore properly takes account of the "wholly different milieu" of a voluntary association. Bazemore, 478 U.S. at 408, 106 S.Ct. at 3013. Under Bazemore latter-day Merideths are not routed to what the government deems the appropriate institution, but may attend any institution they wish. Under Green as contended for by plaintiffs they may attend only the institutions that a federal judge has meticulously selected, grafted and pruned for them.
 
 
 48
 We therefore hold that to fulfill its affirmative duty to disestablish its prior system of de jure segregation in higher education, the state of Mississippi satisfies its constitutional obligation by discontinuing prior discriminatory practices and adopting and implementing good-faith, race-neutral policies and procedures.[11]C. The District Court Judgment
 
 
 49
 The district court concluded that the State of Mississippi had met its affirmative duty to disestablish its former de jure segregated system of higher education. Underlying this conclusion are the numerous findings outlined above regarding Mississippi's adoption of good-faith, race-neutral policies and procedures in the several components of higher education under review. The district court properly treated Mississippi's current practices as matters of fact. Pullman-Standard v. Swint, 456 U.S. 273, 288-90, 102 S.Ct. 1781, 1789-91, 72 L.Ed.2d 66 (1982); Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 534 & n. 8, 99 S.Ct. 2971, 2977 & n. 8, 61 L.Ed.2d 720 (1979). We therefore review those findings for clear error. Fed.R.Civ.P. 52(a); Pullman-Standard, 456 U.S. at 290, 102 S.Ct. at 1791.
 
 
 50
 The plaintiffs argue that the district court should have assessed the defendants' practices under Green, and the plaintiffs' allegations of clear error rest in large part on the contention that the court applied the incorrect remedial duty. Consequently, with respect to many of the court's findings the plaintiffs do not argue in the usual manner that the findings are clearly erroneous, but rather that the court reviewed the facts under the wrong standard and thus drew the wrong conclusions from those facts. A large number of the court's findings are therefore themselves not in dispute and, as discussed below, when reviewed under the standards this Court has adopted, point only to institutional, not constitutional, inequities. Two components at issue, however, bear directly on the choices afforded to current and potential students at Mississippi universities. Mission designation and admissions criteria require close review, since it is chiefly through these components that Mississippi either satisfies or fails to satisfy its duty to provide true choice to its citizens.
 
 
 51
 (i )
 
 
 52
 The plaintiffs argue that the mission designations perpetuate the inequalities of the prior dual system, because missions were assigned on the basis of the institutional resources as they existed at the time of designation. The essence of the argument is that historically black institutions remain "Black Schools" by the regional or urban designation. We recognize that for purposes of this lawsuit it is necessary to describe institutions as either historically black or historically white. But since this lawsuit examines the current practices of the state of Mississippi, the use of the terms Black School and White School, based as they are on racial identifiability alone, is misleading. In the context of mission designation these terms imply that institutions wear an urban or regional designation as an individual would wear the mark of a lower rank. What is wholly ignored by the terms Black School and White School is that the rights of citizens, not institutions, are at issue in this lawsuit, and it is from the standpoint of individual rights, not institutional parity, that Mississippi's practices must be reviewed. The law clearly does not permit state universities to assert equal protection rights in the manner of an individual. See United States v. Alabama, 791 F.2d 1450, 1454-57 (11th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987). Despite the plaintiffs' assurance that they do not make any such argument, their desire that Mississippi universities be redesignated so as to enlarge the scope of education at the historically black institutions is no less than a request to allot an equal protection remedy to those institutions in the manner of an individual. If black citizens in Mississippi may choose among any of the eight universities in the state, it is no denial of their right to equal protection that certain institutions formerly segregated by law continue to provide a more limited range of educational options than other institutions in the state.
 
 
 53
 The district judge found that the mission designations were not motivated by a discriminatory purpose but were rationally based on sound educational policies and a need to conserve scarce educational resources. Ayers I, 674 F.Supp. at 1561. Dr. Larry Leslie, Professor and Director of Higher Education at the University of Arizona, testified for the plaintiffs concerning the funding of the institutions. In one portion of his analysis he sought to compare the funding among the institutions within each of the mission designations. Because there were no predominantly black institutions in the comprehensive category and no predominantly white institutions in the urban category, he compared the three comprehensive schools to the one urban school. As of 1986 he found greater total revenue per student, greater state and local appropriation, greater tuition and fees collected, and somewhat greater gifts, grants, contracts, and other income at the comprehensive universities than at the urban, predominantly black, university. It is reasonable to conclude that, at least to some degree, these findings reflect the different missions of the institutions being compared. In comparing both predominantly black and predominantly white institutions within the regional category, however, Dr. Leslie described his findings as "mixed." As of 1986 Alcorn State and Mississippi University for Women received the greatest total revenue per student, with Delta State and Mississippi Valley State somewhat far behind. Alcorn State also collected more in tuition, fees, gifts, grants, contracts, and other income than any other regional university, and spent markedly more for instruction and other activities per student. Dr. Leslie's testimony as a whole indicates that the state is faithful to the mission designations and is not using them to disguise unequal treatment of those who attend predominantly black institutions.
 
 
 54
 Dr. John Millett, an academic consultant on issues in higher education and administration, testified for the defendants on the subject of mission designations. He believed that the 1981 mission statements had confirmed the existing structure of the state universities. He also stated that the United States Department of Education similarly classifies all academic institutions by purpose as either doctoral granting, comprehensive, general baccalaureate, specialized, and two-year. In his opinion Mississippi's mission designations were well-defined, educationally sound, and efficient.
 
 
 55
 Dr. Joseph Johnson, Vice President for Development at the University of Tennessee, testified for the defendants as an expert in higher education administration and finance. He stated that in a 1984-85 study comparing Mississippi's comprehensive universities (historically white) to universities of similar mission elsewhere in the South, the Mississippi institutions faired worse in funding than all other institutions. The one urban institution (historically black) and the four regional institutions (two historically black and two historically white) in Mississippi, on the other hand, stood above the average for like institutions in the South. For the academic year 1985-86 he believed that the two predominantly black universities designated as regional were much better financed than Mississippi's comprehensive institutions relative to institutions of similar mission in other states.
 
 
 56
 Dr. Thomas Meredith, an academic programs officer for the Board of Trustees, testified that the mission statements did have the effect of maintaining the status quo of program offerings at the predominantly black universities. He was asked by counsel for the United States whether the mission statements limited the level and scope of programs at those institutions, and responded as follows:
 
 
 57
 It put boundaries around all institutions. Up until that time all institutions had been operated under the premise that they needed to do everything for everyone. We were a state of two and a half million people and dwindling resources, and the Board of Trustees felt that it needed to give each institution a direction, and boundaries as well, and utilizing all of the elements that you see in the mission statements that the state would be covered. All of those things would be addressed that this state needed to be about and needed to have, but, yes, institutions did have boundaries. You need to concentrate your resources on certain things and quit trying to just keep on doing more. That was a problem.
 
 
 58
 The record therefore supports the plaintiffs' argument that the mission designations had the effect of maintaining the more limited program scope at the historically black universities. As noted above, however, this fact alone does not deny the plaintiffs their right to equal protection. The record amply supports the findings of the district court that the designations are commonly used, educationally sound, and not motivated by discriminatory intent. Those findings are not clearly erroneous. This is not to say the mission designations adopted by Mississippi efficiently allocate the state's resources. The district judge concluded the very opposite. Ayers I, 674 F.Supp. at 1563-64. This Court nevertheless cannot pass on the financial wisdom of the designations. It is necessary only that black citizens enjoy full equal protection of the laws in attending their choice of institution, however financially infirm the system of higher education as a whole may be.
 
 
 59
 (ii )
 
 
 60
 The plaintiffs challenge the policies governing admission to the eight universities on several grounds. They first argue that the ACT requirement was adopted for a discriminatory purpose and continues to have a severe discriminatory impact on black applicants. They therefore argue that the ACT policy is intentionally discriminatory and violates equal protection. In support of their argument they cite Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). In Hunter the Supreme Court struck down a provision of the Alabama Constitution adopted by convention in 1901 which disenfranchised persons convicted of crimes of moral turpitude. The Court held that because the provision was motivated by a desire to discriminate against blacks and the provision continued to have that effect, it violated equal protection. Id. at 233. The plaintiffs' argument ignores the fact that Mississippi's current admissions policies trace chiefly to the latter 1970's and, as the district court correctly found, the Board was not then motivated by discriminatory intent but by the problem of underpreparation of incoming students. The racial impact of the Board's 1961 blanket ACT requirement, adopted undeniably for discriminatory purposes, has been negated by the numerous qualifications and exceptions outlined earlier. The bare requirement that the test be taken no longer prevents anyone's admission to Mississippi universities. The ability of an applicant to transfer from a junior college without satisfying an ACT score requirement led the district court correctly to conclude that no applicant is denied the opportunity to attend a Mississippi university for failure to achieve a particular score. In addition, minimum score requirements were not adopted until long after the test requirement, and the fact that the minimum score requirement may have discriminatory impact does not render it unconstitutional. Washington v. Davis, 426 U.S. 229, 239-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976).
 
 
 61
 The plaintiffs also argue that the defendants' admissions practices are intentionally discriminatory, because the Board does not require the use of high school grades in conjunction with ACT scores. The plaintiffs note that the American College Testing Program recommends that ACT scores be used in conjunction with other criteria such as grades in order to gain as complete a profile as possible of the applicant.
 
 
 62
 We find no support in the record for the assertion that the Board's failure to use grades as an admissions component points to intentional discrimination. First, while the Board itself does not require the use of high school grades, the individual institutions do use grades in identifying high-risk or exceptional students for special admission. Second, even assuming the policy is narrow, inaccurate, and educationally unsound, it does not follow that the policy is thereby intentionally discriminatory. Third, Dr. Meredith testified that in 1976 there was concern both in Mississippi and nationally with grade inflation, that grades did not mean as much as they used to mean, and that they were not a true reflection of what an applicant had learned. He stated that primary and secondary schools varied tremendously from one part of the state to another, particularly in the sciences where, for example, a given school might offer chemistry without providing lab facilities. He also stated that the Board was advised by ACT administrators that while the use of grades with the ACT would provide a better assessment, they were satisfied with the use of the ACT alone. Dr. Meredith's testimony is supported by the fact that, as with grades generally, the Board does not require students to achieve a certain grade point average in completing the core curriculum.
 
 
 63
 The plaintiffs also argue that the district court's findings improperly focussed on reasonableness and neutrality rather than viewing the policies from the standpoint of an affirmative remedial obligation. Although we believe, as discussed above, that the duty outlined in Green does not apply in this case, we would be reluctant to say the defendants have not met their duty even under Green. The admissions policies of the various institutions are extremely flexible and address both academic preparation and the need to recognize less common measures of achievement. The comprehensive institutions maintain a very modest ACT score requirement while setting aside a portion of their enrollment for those who do not meet the objective criteria. Only a few black first-time applicants are turned away from the comprehensive universities for failure to meet the ACT score requirement. Students are required to satisfy a course of core studies in high school, but they are required only to attend, not to achieve a particular grade-point average. The district court gave full consideration to all aspects of the admissions process and found that current admissions policies and procedures in effect in Mississippi universities were adopted and developed in good faith and for nondiscriminatory purposes. These findings are not clearly erroneous.
 
 
 64
 (iii )
 
 
 65
 The plaintiffs have raised several arguments regarding racial incidents at the University of Mississippi, the racial composition of the faculty and staff, unsuccessful applicants for administrative positions at Mississippi State University, and the fact that a black has not occupied a particular seat on the Board of Trustees. While these problems may be serious, they do not provide enough of a factual basis to persuade us that the district court erred in concluding Mississippi had met its duty to dismantle its dual system.
 
 
 66
 With respect to the racial composition of the faculty and staff specifically, the record indicates that from at least 1977 to 1986 the percentage of black faculty hired at each of the five predominantly white universities significantly exceeded the black representation in the qualified labor pool. Bernard Siskin, a statistician and labor analyst, testified on faculty hiring and composition, among other matters. He provided both a "snapshot" of faculty present at a given time and a study of hiring over a period of time. The current aggregate faculty composition showed black representation lower than the qualified labor pool, a result Siskin attributed to pre-1974 hires and high black turnover. At two of the institutions Siskin stated that the discrepancy between black hiring and current black representation had disappeared through post-1974 hiring and the turnover of older faculty.
 
 
 67
 Dr. Forest Wyatt, President of Delta State University, testified that the Board had communicated with his institution regarding increasing black faculty and other employment. He stated that he was instructed to increase black presence at Delta State and that the instructions were forwarded to deans, department heads, and others in employment positions at the university. He believed those individuals carried out those goals to the best of their ability. He also testified specifically regarding the university's successful effort to recruit a black admissions counselor to attract more black students to the university.
 
 
 68
 Dr. Victor Feisal, Vice-president for academic affairs at Memphis State University, testified concerning the difficulties in minority faculty recruitment. He stated there was a tremendous shortage of black students with graduate degrees, and extreme competition among educational institutions and the business community for their services. He also stated that financial conditions made it particularly difficult for Mississippi to attract those candidates, because Mississippi is not competitive with other states in faculty salaries and funding of higher education.
 
 
 69
 (iv )
 
 
 70
 The plaintiffs have pointed to disparities between the historically black and historically white institutions regarding program offerings and duplication among universities and branch centers, faculty, funding, library volumes, facilities, and land grant programs. The district court correctly concluded that the defendants had met or exceeded their duty to disestablish prior de jure segregation in these areas, and we have nothing to add to the district court's opinion except the following.
 
 
 71
 The district court incorrectly concluded that the disparities among the institutions were not reminiscent of the former de jure segregated system. Ayers I, 674 F.Supp. at 1560. On the contrary, the disparities are very much reminiscent of the prior system. The inequalities among the institutions largely follow the mission designations, and the mission designations to some degree follow the historical racial assignments. But this does not mean the plaintiff class is denied equal educational opportunity or equal protection of law. The defendants have adopted good-faith, race-neutral policies and procedures and have fulfilled or exceeded their duty to open Mississippi universities to all citizens regardless of race. Their policies toward institutions are not racially motivated. Institutional differences remain, but in order to level those differences under principles of equal protection this Court would somehow have to adopt the plaintiffs' terms "Black School" and "White School" and attach legal significance to those terms. This Court therefore cannot adjust the equities in the manner the plaintiffs request unless we declare, with the force of law, that Alcorn State University, Jackson State University, and Mississippi Valley State University, shall henceforth be designated as Black Schools for black students, and shall at all times remain equal in funding, offerings and facilities with their counterparts designated as White schools. We need not cite the source for this revolting principle.
 
 
 72
 The judgment is AFFIRMED.
 
 
 73
 GOLDBERG, Circuit Judge, with whom POLITZ, KING and JOHNSON, Circuit Judges, join, dissenting:
 
 
 74
 I respectfully dissent from the well-organized and well-expressed opinion written by Judge Duhe for the en banc court. This opinion is an important one, and one would expect there to be diverse opinions, but that does not diminish the strength of my conviction that the district court judgment should be reversed. Judge Duhe has admirably expounded the en banc court's point of view, but I adhere to the panel's majority opinion. Ayers v. Allain, 893 F.2d 732 (5th Cir.1990).
 
 
 75
 I do not wish to trespass on the court's time in needless elaboration or repetition. The district court and our panel have already thoroughly analyzed this case. Many hours have previously been expended in its explication. The jurisprudence explored and the authorities cited in the panel's majority opinion clearly point to the conclusion that this case should be remanded to the district court. I would remand for proceedings not inconsistent with the principles and doctrines expostulated in the original panel's majority opinion.
 
 
 76
 PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring* in part and dissenting in part. POLITZ and KING, Circuit Judges, join in the dissent portion of this opinion.
 
 
 77
 The district court held that the State of Mississippi has no duty to eliminate the vestiges or effects of its overt discrimination against blacks in the administration of its university system. To the contrary, the district court concluded that the state's obligation ended when it adopted an open admissions policy and stopped purposeful racial discrimination. Today, we affirm this erroneous view of Mississippi's obligation to its black residents. I dissent.
 
 
 78
 The district court has prepared a careful opinion exploring the difficulties and complexities of the university system, and the majority finds record support for the district court's factual findings. The difficulty is that the majority today deferentially affirms the district court's answer to the wrong question. That deference is undue. It is well settled that "if the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." Inwood Laboratories v. Ives Laboratories, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982) (citing United States v. Singer Manufacturing Co., 374 U.S. 174, 177, 83 S.Ct. 1773, 1775, 10 L.Ed.2d 823 (1963)). I would not attempt to adopt the correct legal standard and on appeal apply it to these facts. Rather, I would remand this case to the district court for application of the correct legal standards. It would be for the trial court to decide whether those standards necessitate a new factual inquiry.
 
 
 79
 The majority denies that Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), extends to higher education, and Judge Goldberg's dissent disputes this assertion. With all respect, the question is not the application of Green to higher education. Green rejected freedom of choice plans as a complete response to the state's duty to end segregated schools. Contrary to the implicit assumptions of the majority, however, Green is not the genesis of the state's constitutional duty to correct the injury it has unconstitutionally caused. The duty to undo the wrong springs directly from Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).
 
 
 80
 To my light, Green rests on a system of mandated education and has little application to a system of higher education that has no compulsory attendance. But concluding that Green is inapplicable to higher education does not carry the further conclusion that a state that has maintained a dejure system does not remain under a continuing obligation to otherwise administer its university program in ways calculated to undo the injuries of its segregated past.
 
 
 81
 Bazemore v. Friday, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), is not contrary to the position I urge today. In Bazemore the court held that, because the students enjoyed the right to choose the club they wished and because the differing make-ups of the clubs were not the product of discrimination, the state had done its duty. Here, we deal with the delivery by a state of an array of educational services. That it has no constitutional duty to achieve any particular racial mix is not necessarily a full response to the more general question of whether it has discharged its duty to undo its wrong. Having openly discriminated in the delivery of educational service in virtually all its operations, Mississippi remains under a duty not to perpetuate segregation by its policies. Curiously, the district court found that
 
 
 82
 the defendants undertake to fund more institutions of higher learning than are justified by the amount of financial resources available to the state, but that is a policy decision of the Legislature that affects the quality of the institutions among which the monies must be so thinly divided. Such a decision by the Legislature goes to the quality of the institutions and not to the constitutionality of the funding.
 
 
 83
 674 F.Supp. 1523, 1564 (N.D.Miss.1987). The district court noted the
 
 
 84
 inefficiency ... of having two state universities only 20 miles apart in the eastern part of the state with separate administrations and duplicating programs, and two state universities on the western side of the state only 50 miles apart, each with separate administrations and duplicating programs.
 
 
 85
 Id. at 1563-64. The district court also found it irrelevant that the state funded "traditionally black and traditionally white universities which duplicate as many as 75% of each other's baccalaureate programs." Id. Funding decisions such as these, however, cannot be passed over so summarily if they frustrate the state's duty to eliminate the vestiges of past discrimination.
 
 
 86
 I reject Green 's application to university education because I do not believe the Fourteenth Amendment supports a substantive right to a particular racial mix, certainly in the absence of mandatory and state controlled attendance. I am persuaded that in this context the command of the Fourteenth Amendment translates to fair process and here find some common ground with the majority. When a system of higher education presents every person with a truly equal and free choice among schools, that system will be constitutional. Well and good, but the long years of separatism have worn deep traces--so deep that declarations of freedom of choice draped over them are not so easily translated to real choice. The force of this reality led to the much debated constitutional rule in Green, fourteen years after Brown v. Board II, and although I maintain that its restatement of Brown is not applicable to higher education, it yet informs the present question whether Mississippi is discharging its duty.
 
 
 87
 A state violates its duty to undo its wrong when it makes decisions that directly reinforce the historical traces of separate post-secondary educational paths for blacks and whites. When a party challenging a particular state action demonstrates the adverse effect of that action on the state's duty to remove vestiges of discrimination, the burden should then shift to the state to identify the legitimate state purpose of the action and to prove the absence of an equally effective, less frustrating alternative. Despite the difficulties in other contexts with this familiar equal protection analysis, here it provides a disciplined process-based inquiry that pushes federal courts toward the sidelines of education policymaking without leaving states free to ignore their duty. This analysis highlights the importance of segregative effects and locates the essential causal relationship between a past dejure dual system and a present de facto one. Columbus Board of Education v. Penick, 443 U.S. 449, 501, 99 S.Ct. 2941, 2958-59, 61 L.Ed.2d 666 (1978) (Rehnquist, J., dissenting) ("The relevance of past acts ... depend[s] on whether 'segregation resulting from those actions continues to exist.' ") (quoting Keyes v. School District, 413 U.S. 189, 210, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973)). Finally, it recognizes that the affirmative duty to undo is confronted in the ongoing administration of the schools. It differs from the majority in another critical respect by not insisting on proof of purpose. Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This case is about remedy--detecting present effects of the earlier wrong and defining the remedial response. By insisting on proof of purpose, the majority wipes away the earlier wrong by denying the very existence of any notion of perpetuation. Perhaps as a matter of fact Mississippi has discharged its duty to undo any present injury from the past. However, we cannot avoid the inquiry by restricting it to purposeful acts.
 
 
 88
 The majority rests its decision on the principle of free choice. I have no quarrel with this abstraction since I view Mississippi's constitutional obligation to be to ensure that freedom of choice is real, not just theoretical. But it is not enough that Mississippi no longer operates a de jure segregated educational system; the state must also cease to perpetuate the traces of segregation.
 
 
 89
 The judiciary is not competent, nor is it otherwise the appropriate institution, to set education policy. But we are duty-bound to decide this case, a case insisting that the state exercise its right to run its schools within the limits of the Constitution. I do not claim to have answers to the difficult questions to be faced in the specifics of what Mississippi can and must do. Perhaps there is little, but that must be decided by the trial judge operating under the correct legal standard.
 
 
 90
 We must view this case against the bold relief of the undisputed fact that the first black students were not admitted to Mississippi's white universities until 1962 and that white students were not admitted to the black universities until 1966. A disproportionate share of funding for facilities went without apology to the white institutions until at least 1970, and faculty desegregation did not even begin until the 1970's. Indeed, no comprehensive plan to dismantle the double system was adopted until 1974, and that plan was rejected by H.E.W. and has never been funded. The black schools were distinctively inferior to the white schools. As part of its program of diversity and free choice the schools were assigned educational missions--the white schools were to be "comprehensive" whereas the black "urban" schools were to serve a less ambitious purpose. This earlier discrimination in funding is now said to be only a reflection of the schools' different missions, which are pointed to as examples of desired diversity in educational offerings.
 
 
 91
 I do not say from this remote appellate post that Mississippi has failed to meet its duty. I say that we have not yet asked that question, and we must.
 
 
 
 [1]
 Chief Judge Clark is recused
 When this case was orally argued before and considered by the court, Judge Reavley was in active service. He participated in both the oral argument and the en banc conference. He took senior status, however, on August 1, 1990.
 
 
 [2]
 Ayers I, 674 F.Supp. at 1524-26, 1528-30; Ayers II, 893 F.2d at 733, 743-44
 
 
 [3]
 The plaintiff class was certified in 1975 as:
 [a]ll black citizens residing in Mississippi, whether students, former students, parents, employees, or taxpayers, who have been, are, or will be discriminated against on account of race in receiving equal educational opportunity and/or equal employment opportunity in the universities operated by said Board of Trustees.
 Ayers I, 674 F.Supp. at 1526.
 
 
 [4]
 At the time the Supreme Court rendered its decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), these institutions were designated for the education of black or white citizens, respectively
 Historically Black Historically White
 Institutions Institutions
 Alcorn State University Delta State University
 Jackson State University Mississippi State University
 Mississippi Valley State University Mississippi University for Women
 University of Mississippi
 University of Southern Mississippi
 
 
 [5]
 See Merideth v. Fair, 305 F.2d 343, 353 (5th Cir.1962)
 
 
 [6]
 The judge found that students who receive a score of 9 on the English and social studies tests are reading at a ninth-grade level
 
 
 [7]
 See Ayers I, 674 F.Supp. at 1530; Ayers II, 893 F.2d at 737-38
 
 
 [8]
 Average cost estimates are based on an aggregation of the institutions into three groups. These groups correspond to the mission designation of the respective universities, except that the University of Southern Mississippi is included with Jackson State University for purposes of establishing an average for the urban group
 
 
 [9]
 Dr. Larry Leslie, Professor and Director of Higher Education at the University of Arizona, testified that the calculation "per full-time equivalent student" was generally performed by adding one-third of the part-time enrollment to the number of students classified as full time. The calculation may also be performed by adding the full-time enrollment to an aggregate of credit hours earned by part-time students divided by the appropriate dividend to reflect full-time equivalence
 
 
 [10]
 Justice White's concurring opinion was incorporated into the per curiam opinion of the Court. See Bazemore, 478 U.S. at 387, 106 S.Ct. at 3002
 
 
 [11]
 The plaintiffs argue that the defendants are required to comply with certain regulations issued by the Office of Civil Rights of the Department of Education. See 34 C.F.R. Sec. 100.3(b)(6)(i) (1989). The regulations generally require a recipient of Title VI assistance who has previously discriminated against persons on the ground of race to take affirmative action to overcome the effects of prior discrimination. Under the present record we are not prepared to say the defendants have failed to meet the duties outlined in the regulations. It is unnecessary, however, to discuss the scope of Mississippi's duty under the regulations. The plaintiffs in Bazemore challenged the extension service's governance of the 4-H and homemaker clubs under Title VI. See Bazemore v. Friday, 751 F.2d 662, 687 n. 128 (4th Cir.1984). There cannot be any question, therefore, that the duty outlined by the Supreme Court in Bazemore controls in Title VI cases
 
 
 *
 I would affirm the district court's judgment that Mississippi is not engaged in purposeful discrimination. It follows that the inquiry on the remand I would order would focus on the causal relationship between the de jure system and the present practices, as I explain in the text